**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WASHINGTON MUTUAL BANK,** | ) | **FORECLOSURE** |
| | ) | |
| **plaintiff,** | ) | |
| | ) | FILED: AUGUST 8, 2008 |
| **vs.** | ) **No.** | 08CV4495 |
| | ) | JUDGE MANNING |
| **JORGE TORRES, JUANA TORRES, BANK OF** | ) | MAGISTRATE JUDGE SCHENKIER |
| **WAUKEGAN, n/k/a NORSTATES BANK, as** | ) | EDA |
| **Trustee under Trust Agreement dated August** | ) | |
| **23, 2002, and known as Trust No. 204453,** | ) | |
| **CHICAGO TITLE LAND TRUST COMPANY,** | ) | |
| **as successor Trustee under Trust Agreement** | ) | |
| **dated August 23, 2002, and known as Trust** | ) | |
| **No. NS204453, 927 GRAND AVENUE FOREVER** | ) | |
| **II, LLC, and FOREVER CONSTRUCTION, INC.,** | ) | |
| | ) | |
| **defendants.** | ) | |

**COMPLAINT**

**JURISDICTION AND VENUE**

1.    Plaintiff is a Federal Savings Association whose principal place of business is in the State of Nevada, and it is a citizen of Nevada.

2.    Defendants Jorge Torres and Juana Torres are residents of Waukegan, Illinois, and are citizens of Illinois; defendant Bank of Waukegan, now known as Norstates Bank, as Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. 204453, is a corporation organized under the laws of the State of Illinois having its principal place of business in Waukegan, Illinois, defendant Chicago Title Land Trust Company, as successor Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. NS204453, is a corporation organized under the laws of the State of Illinois having its principal place of business in Chicago, Illinois, 927 Grand Avenue Forever II, LLC is an Illinois limited liability company, having its principal place of business in Waukegan, Illinois, and defendant Forever Construction, Inc. is a corporation organized under the laws of the State of Illinois, having its principal place of business in Waukegan, Illinois.

3.    The amount in controversy, exclusive of costs and interest, exceeds the sum of $75,000.00, and this court has diversity jurisdiction under 28 U.S.C. §1332.

4.    Venue is proper in this District under 28 U.S.C. §1391(a) because a substantial part of the events giving rise to the claims alleged herein occurred in this District, and all defendants reside in this District.

## COUNT I – FOR FORECLOSURE OF A MORTGAGE

Plaintiff, Washington Mutual Bank, by its attorney, John K. Kallman, for its Complaint to Foreclose Mortgage, states as follows:

1-4.  Plaintiff realleges the allegations regarding jurisdiction and venue contained in paragraphs one through four.

5.    Plaintiff files this Complaint to Foreclose Mortgage to foreclose the mortgage, trust deed or other conveyance in the nature of a mortgage (hereinafter called "Mortgage") hereinafter described and joins the following persons and entities as defendants:

> Jorge Torres, Juana Torres, Bank of Waukegan, now known as Norstates Bank, as Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. 204453, Chicago Title Land Trust Company, successor Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. NS204453, 927 Grand Avenue Forever II, LLC, and Forever Construction, Inc.

6.    Attached hereto as Exhibit A is a copy of the Mortgage, and as Exhibit B is a copy of the Note secured thereby.

7.    Information concerning Mortgage:

A.    Nature of instrument:    Mortgage, Security Agreement, Assignment of Rents and Fixture Filing.

B.    Date of Mortgage: November 28, 2005.

C.    Name of mortgagor:    Bank of Waukegan, now known as Norstates Bank, as Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. 204453.

D.    Name of mortgagee:  Washington Mutual Bank.

E.    Date and place of recording:   December 15, 2005, in the Office of the Recorder of Deeds of Lake County, Illinois.

F.    Identification of recording:   Document No. 5915285.

G.    Interest subject to mortgage:     Fee simple absolute.

2

H.  Amount of original indebtedness, including subsequent advances made under Mortgage: $370,000.00.

I.  Both the legal description of the mortgaged real estate and the common address or other information sufficient to identify it with reasonable certainty:

SEE EXHIBIT A HERETO

PIN's:  08-21-117-012-0000

Common Address:    927 Grand Avenue, Waukegan, IL.

J.  Statement as to defaults:

Mortgagor has not paid the monthly installments of principal, taxes, interest and insurance from June 1, 2008 to the present; the principal balance due on the Note and Mortgage is $358,473.75, plus accrued and accruing interest, costs, advances, fees and attorneys' fees; mortgagor has failed to pay real estate taxes on the mortgaged premises for the tax year 2007 in the aggregate amount of $10,943.37.

K.  Name of present owner of the real estate:  Chicago Title Land Trust Company, as successor Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. NS204453.

L.  Names of other persons or entities who are joined as defendants and whose interest in or lien on the mortgaged real estate is sought to be terminated:

Jorge Torres, Juana Torres, Bank of Waukegan, now known as Norstates Bank, as Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. 204453, 927 Grand Avenue Forever II, LLC, and Forever Construction, Inc.

M.  Names of defendants claimed to be personally liable for deficiency, if any:    Forever Construction, Inc.

Please note that no personal deficiency will be sought against any party who has received a Chapter 7 discharge.

N.  Capacity in which plaintiff brings this foreclosure:        Owner and holder of the indebtedness evidenced by the Note and secured by the Mortgage, or as servicing agent for such Owner and holder.

O.  Facts in support of shortened redemption period:  Not sought.

P.  Statement that the right of redemption has been waived by all owners of redemption, if applicable: Section 7.1(e) of the Mortgage waives the right of redemption.

Q.  Facts in support of request for attorneys' fees and of costs and expenses, if applicable:  The Mortgage and the Note so provide.

3

R.  Facts in support of a request for appointment of mortgagee in possession or for appointment of a receiver, and identity of such receiver, if sought:    Section 5.3(a) of the Mortgage provides that upon default plaintiff has the right to have a receiver appointed.    Plaintiff prays for appointment of Donald Shapiro as receiver.

S.  Offer to mortgagor in accordance with Section 15-1402 to accept title to the real estate in satisfaction of all indebtedness and obligations secured by the Mortgage without judicial sale, if sought:    Not sought; however, plaintiff alleges that it is not precluded from making or accepting such offer by the filing of the Complaint.

T.  Name or names of defendants whose rights to possess the mortgaged real estate, after the confirmation of a foreclosure sale, are sought to be terminated and, if not elsewhere stated, the facts in support thereof:

Jorge Torres, Juana Torres, Bank of Waukegan, now known as Norstates Bank, as Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. 204453, Chicago Title Land Trust Company, as successor Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. NS204453, 927 Grand Avenue Forever II, LLC, and Forever Construction, Inc.

8.    Plaintiff avers that in addition to persons designated by name herein and the Unknown Defendants hereinabove referred to, there are other persons, and/or non-record claimants who are interested in this action and who have or claim some right, title, interest or lien in, to or upon the real estate, or some part thereof, in the Complaint described, including but not limited to the following:    None.

**WHEREFORE**, plaintiff prays for:

(i)    A judgment of foreclosure and sale;

(ii)    An order granting a shortened redemption period, if sought;

(iii)  A personal judgment for a deficiency, if applicable and sought, and only against parties who have not received a Chapter 7 bankruptcy discharge;

(iv)   An order granting possession, if sought;

(v)    An order placing the mortgagee in possession or appointing a receiver, if sought;

(vi)   A judgment for attorneys' fees, costs and expenses, if sought;

(vii)  Such other and further relief as is allowed at law and in equity, and as this court may grant.

## <u>COUNT II – ON A GUARANTY</u>

1-4.  Plaintiff realleges the allegations regarding jurisdiction and venue of Count I of this Complaint.

5.    On or about November 28, 2005 defendants Forever Construction, Inc. and Bank of Waukegan, now known as Norstates Bank, as Trustee under that certain Trust Agreement dated August 23, 2002 and known as Trust No. 204453 borrowed the sum of $370,000.00 from plaintiff, evidenced by that certain Promissory Note dated November 28, 2005, a true and correct copy of which is attached hereto as Exhibit B.

6.    On or about November 28, 2005, defendant Jorge Torres executed and delivered to plaintiff a Guaranty of payment of such Note, a true and correct copy of which is attached hereto as Exhibit C.

7.    The Note and Guaranty are in default for failure to make the payments due on March 1, 2008 and following.  There is due under the Note and Guaranty, as of July 11, 2008, the sum of $358,473.75, plus interest and default interest, late charges, attorneys' fee, expenses and costs..  Interest, late charges and attorneys' fees, costs and expenses continue to accrue.

WHEREFORE, plaintiff prays for judgment against defendant Jorge Torres for $358,473.75, plus interest, default interest, late charges, attorneys' fees, costs and expenses, and such other sums as may become due under the Note and Guaranty at the time of judgment, plus costs of suit.


_____/s/ John K. Kallman_____

John K. Kallman
plaintiff's attorney
221 North LaSalle Street
Suite 1200
Chicago, IL  60601
(312) 578-1515
ARDC No. 25182
jkkallman@sbcglobal.net

5915285

Loan No.: 625640141    MAGISTRATE JUDGE SCHENKIER
EDA

FILED FOR RECORD BY:
MARY ELLEN VANDERVENTER
LAKE COUNTY, IL RECORDER
12/15/2005 - 12:37:55 P.M.
RECEIPT #: 260832
RHSP $10.00
DRAWER #: 21

**RECORDING REQUESTED BY AND WHEN**
**RECORDED MAIL TO:**

WASHINGTON MUTUAL BANK, a federal association
Attention: MFL Closing
National Commercial Operations Center
P.O. Box 9011
Coppell, TX 75019-9011

**THIS INSTRUMENT PREPARED BY:**

WASHINGTON MUTUAL BANK, a federal association
National Commercial Operations Center
P.O. Box 9178
Coppell, Texas 75019-9178                    *ABOVE SPACE FOR RECORDER'S USE*

**BE ADVISED THAT THE PROMISSORY NOTE SECURED BY THIS SECURITY INSTRUMENT MAY PROVIDE FOR ONE OR MORE OF THE FOLLOWING: (1) A VARIABLE RATE OF INTEREST; (2) A BALLOON PAYMENT AT MATURITY; (3) DEFERRAL OF A PORTION OF ACCRUED INTEREST UNDER CERTAIN CIRCUMSTANCES WITH INTEREST SO DEFERRED ADDED TO THE UNPAID PRINCIPAL BALANCE OF THE NOTE AND SECURED HEREBY.**

**MORTGAGE, SECURITY AGREEMENT,**
**ASSIGNMENT OF LEASES AND RENTS**
**AND FIXTURE FILING**

THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (this "Security Instrument"), is made this 28th day of November, 2005 between
Bank of Waukegan as Trustee under Trust Agreement Dated August 23, 2002 Known as Trust Number 204453, N/K/A NORSTATES BANK

the address of which is 1601 North Lewis, Waukegan, IL 60085, as mortgagor ("Borrower"); and WASHINGTON MUTUAL BANK, a federal association, at its offices at National Commercial Operations Center, P.O. Box 9178, Coppell, Texas 75019-9178, Attention: Portfolio Administration, as mortgagee ("Lender").

1.  **GRANTING CLAUSE.** Borrower, in consideration of the acceptance by Lender of this Security Instrument, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the obligations described in Section 3 below, irrevocably mortgages, warrants, grants, conveys and assigns to Lender and its successors and assigns, forever, all of Borrower's estate, right, title, interest, claim and demand in and to the property in the county of Lake, state of Illinois, with a street address of 927 Grand Ave., Waukegan, IL 60085 (which address is provided for reference only and shall in no way limit the description of the real and personal property otherwise described in this Section 1), described as follows, whether now existing or hereafter acquired (all of the property described in all parts of this Section 1 and all additional property, if any, described in Section 2 is called the "Property"):

1.1 **Land and Appurtenances.** The land described on Exhibit A hereto, and all tenements, hereditaments, rights-of-way, easements, appendages and appurtenances thereto belonging or

EXHIBIT A

28

P.10/46    To:1847 623 3593    773386S001    111200SHUCH6001111    NOV-29-2005 13:20 From:PMCHG001

Loan No.: 625640141

in any way appertaining, including without limitation all of the right, title and interest of Borrower in and to any avenues, streets, ways, alleys, vaults, strips or gores of land adjoining that property, all rights to water, water stock, drains, drainage and air rights relating to that property, and all claims or demands of Borrower either in law or in equity in possession or expectancy of, in and to that property; and

1.2 **Improvements and Fixtures**. All buildings, structures and other improvements now or hereafter erected on the property described in 1.1 above, and all facilities, fixtures, machinery, apparatus, installations, goods, equipment, inventory, furniture, building materials and supplies and other properties of whatsoever nature, now or hereafter located in or used or procured for use in connection with that property, it being the intention of the parties that all property of the character described above that is now owned or hereafter acquired by Borrower and that is affixed or attached to, stored upon or used in connection with the property described in 1.1 above shall be, remain or become a portion of that property and shall be covered by and subject to the lien of this Security Instrument, together with all contracts, agreements, permits, plans, specifications, drawings, surveys, engineering reports and other work products relating to the construction of the existing or any future improvements on the Property, any and all rights of Borrower in, to or under any architect's contracts or construction contracts relating to the construction of the existing or any future improvements on the Property, and any performance and/or payment bonds issued in connection therewith, together with all trademarks, trade names, copyrights, computer software and other intellectual property used by Borrower in connection with the Property; and

1.3 **Enforcement and Collection**. Any and all rights of Borrower without limitation to make claim for, collect, receive and receipt for any and all rents, income, revenues, issues, earnest money, deposits, refunds (including but not limited to refunds from taxing authorities, utilities and insurers), royalties, and profits, including mineral, oil and gas rights and profits, insurance proceeds of any kind (whether or not Lender requires such insurance and whether or not Lender is named as an additional insured or loss payee of such insurance), condemnation awards and other moneys, payable or receivable from or on account of any of the Property, including interest thereon, or to enforce all other provisions of any other agreement (including those described in Section 1.2 above) affecting or relating to any of the Property, to bring any suit in equity, action at law or other proceeding for the collection of such moneys or for the specific or other enforcement of any such agreement, award or judgment, in the name of Borrower or otherwise, and to do any and all things that Borrower is or may be or become entitled to do with respect thereto, provided, however, that no obligation of Borrower under the provisions of any such agreements, awards or judgments shall be impaired or diminished by virtue hereof, nor shall any such obligation be imposed upon Lender; and

1.4 **Accounts and Income**. Any and all rights of Borrower in any and all accounts, rights to payment, contract rights, chattel paper, documents, instruments, licenses, contracts, agreements and general intangibles relating to any of the Property, including, without limitation, income and profits derived from the operation of any business on the Property or attributable to services that occur or are provided on the Property or generated from the use and operation of the Property; and

1.5 **Leases**. All of Borrower's rights as landlord in and to all existing and future leases and tenancies, whether written or oral and whether for a definite term or month to month or otherwise, now or hereafter demising all or any portion of the property described in 1.1 and 1.2 above, including all renewals and extensions thereof and all rents, deposits and other amounts received or receivable thereunder (in accepting this Security Instrument Lender assumes no liability for the performance of any such lease); and

1.6 **Books and Records**. All books and records of Borrower relating to the foregoing in any form.

2

Loan No.: 625640141

## 2. SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS.

2.1 **Security Agreement**. To the extent any of the property described in Section 1 is personal property, Borrower, as debtor, grants to Lender, as secured party, a security interest therein together with a security interest in all other personal property of whatsoever nature that is located on or used or to be used in connection with any of the property described in Section 1, and any products or proceeds of any thereof, pursuant to the Uniform Commercial Code of the state of Illinois (the "UCC"). on the terms and conditions contained herein. Borrower hereby authorizes Lender to file any financing statement, fixture filing or similar filing to perfect the security interests granted in this Security Instrument without Borrower's signature.

### 2.2 **Assignment of Leases and Rents**.

(a)    **Absolute Assignment**. Borrower hereby absolutely and unconditionally grants, transfers, conveys, sells, sets over and assigns to Lender all of Borrower's right, title and interest now existing and hereafter arising in and to the leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements, either oral or written, now existing and hereafter arising which affect the Property, Borrower's interest therein or any improvements located thereon, together with any and all security deposits, guaranties of the lessees' or tenants' obligations (including any and all security therefor) and other security under any such leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements (all of the foregoing, and any and all extensions, modifications and renewals thereof, shall be referred to, collectively, as the "Leases"), and hereby gives to and confers upon Lender the right to collect all the income, rents, issues, profits, royalties and proceeds from the Leases and any business conducted on the Property and any and all prepaid rent and security deposits thereunder (collectively, the "Rents"). This Security Instrument is intended by Lender and Borrower to create and shall be construed to create an absolute assignment to Lender of all of Borrower's right, title and interest in and to the Leases and the Rents and shall not be deemed merely to create a security interest therein for the payment of any indebtedness or the performance of any obligations under the Loan Documents (as defined below). Borrower irrevocably appoints Lender its true and lawful attorney at the option of Lender at any time to demand, receive and enforce payment, to give receipts, releases and satisfactions and to sue, either in the name of Borrower or in the name of Lender, for all such Rents and apply the same to the obligations secured by this Security Instrument.

(b)    **Revocable License to Collect**. Notwithstanding the foregoing assignment of Rents, so long as no Event of Default (as defined below) remains uncured, Borrower shall have a revocable license, to collect all Rents, and to retain the same. Upon any Event of Default, Borrower's license to collect and retain Rents shall terminate automatically and without the necessity for any notice.

(c)    **Collection and Application of Rents by Lender**. While any Event of Default remains uncured: (i) Lender may at any time, without notice, in person, by agent or by court-appointed receiver, and without regard to the adequacy of any security for the obligations secured by this Security Instrument, enter upon any portion of the Property and/or, with or without taking possession thereof, in its own name sue for or otherwise collect Rents (including past due amounts); and (ii) without demand by Lender therefor, Borrower shall promptly deliver to Lender all prepaid rents, deposits relating to Leases or Rents, and all other Rents then held by or thereafter collected by Borrower, whether prior to or during the continuance of any Event of Default. Any Rents collected by or delivered to Lender may be applied by Lender against the obligations secured by this Security Instrument, less all expenses, including attorneys' fees and disbursements, in such order as Lender shall determine in its sole and absolute discretion. No application of Rents against any obligation secured by this Security Instrument or other action taken by Lender under this Section 2.2 shall be deemed or construed to cure or waive any Event of

3

Loan No.: 625640141

Default, or to invalidate any other action taken in response to such Event of Default, or to make Lender a mortgagee-in-possession of the Property.

(d)    **Direction to Tenants**. Borrower hereby irrevocably authorizes and directs the tenants under all Leases to pay all amounts owing to Borrower thereunder to Lender following receipt of any written notice from Lender that states that an Event of Default remains uncured and that all such amounts are to be paid to Lender. Borrower further authorizes and directs all such tenants to pay all such amounts to Lender without any right or obligation to inquire as to the validity of Lender's notice and regardless of the fact that Borrower has notified any such tenants that Lender's notice is invalid or has directed any such tenants not to pay such amounts to Lender.

3.    **OBLIGATIONS SECURED**. This Security Instrument is given for the purpose of securing:

3.1  **Performance and Payment**.  The performance of the obligations contained herein and the payment of $370,000.00 with interest thereon and all other amounts payable according to the terms of a promissory note of even date herewith made by Borrower, payable to Lender or order, and having a maturity date of December 1, 2035, and any and all extensions, renewals, modifications or replacements thereof, whether the same be in greater or lesser amounts (the "Note"), which Note may provide for one or more of the following: (a) a variable rate of interest; (b) a balloon payment at maturity; or (c) deferral of a portion of accrued interest under certain circumstances with interest so deferred added to the unpaid principal balance of the Note and secured hereby.

3.2  **Future Advances**.  The repayment of any and all sums advanced or expenditures made by Lender subsequent to the execution of this Security Instrument for the maintenance or preservation of the Property or advanced or expended by Lender pursuant to any provision of this Security Instrument subsequent to its execution, together with interest thereon. The total principal amount of the obligations secured hereby shall not exceed at any one time an amount equal to two hundred percent (200%) of the amount referred to in Section 3.1, plus interest. Nothing contained in this Section, however, shall be considered as limiting the interest which may be secured hereby or the amounts that shall be secured hereby when advanced to enforce or collect the indebtedness evidenced by the Note or to protect the real estate security and other collateral.

3.3  **Other Amounts**.  All other obligations and amounts now or hereafter owing by Borrower to Lender under this Security Instrument, the Note or any other document, instrument or agreement evidencing, securing or otherwise relating to the loan evidenced by the Note and any and all extensions, renewals, modifications or replacements of any thereof (collectively, the "Loan Documents"); provided, however, that this Security Instrument does not and shall not in any event be deemed to, secure the obligations owing to Lender under: (a) any certificate and indemnity agreement regarding hazardous substances (the "Indemnity Agreement") executed in connection with such loan (or any obligations that are the substantial equivalent thereof); or (b) any guaranty of such loan.

4.    **WARRANTIES AND COVENANTS OF BORROWER**.  Borrower warrants, covenants, and agrees:

4.1  **Warranties**.

(a)    Borrower has full power and authority to mortgage the Property to Lender and warrants the Property to be free and clear of all liens, charges, and other monetary encumbrances except those appearing in the title insurance policy accepted by Lender in connection with this Security Instrument.

Loan No.: 625640141

        (b)    The Property is free from damage and no matter has come to Borrower's attention (including, but not limited to, knowledge of any construction defects or nonconforming work) that would materially impair the value of the Property as security.

        (c)    The loan evidenced by the Note and secured by this Security Instrument is primarily for commercial, industrial or business purposes and is not primarily for personal, family or household purposes.

    **4.2 Preservation of Lien.**  Borrower will preserve and protect the priority of this Security Instrument as a first lien on the Property. If Borrower fails to do so, Lender may take any and all actions necessary or appropriate to do so and all sums expended by Lender in so doing shall be treated as part of the obligations secured by this Security Instrument, shall be paid by Borrower upon demand by Lender and shall bear interest at the highest rate borne by any of the obligations secured by this Security Instrument.

    **4.3 Repair and Maintenance of Property.**  Borrower will keep the Property in good condition and repair, which duty shall include but is not limited to cleaning, painting, landscaping, repairing, and refurbishing of the Property; will complete and not remove or demolish, alter, or make additions to any building or other improvement that is part of the Property, or construct any new structure on the Property, without the express written consent of Lender; will underpin and support when necessary any such building or other improvement and protect and preserve the same; will complete or restore promptly and in good and workmanlike manner any such building or other improvement that may be damaged or destroyed and pay when due all claims for labor performed and materials furnished therefor; will not commit, suffer, or permit any act upon the Property in violation of law; and will do all other acts that from the character or use of the Property may be reasonably necessary for the continued operation of the Property in a safe and legal manner, the specific enumerations herein not excluding the general.

    **4.4 Insurance.**

        **4.4.1    All Risk/Hazard.**  Borrower will provide and maintain, as further security for the faithful performance of the obligations secured by this Security Instrument, insurance covering fire and other perils substantially equivalent to those insured under the Causes of Loss  Special Form published by the Insurance Service Office ("ISO"), and against such other perils as may be specified by Lender (including insurance against earthquake/earth movement, if required by Lender on a case-by-case basis) in an amount not less than one hundred percent (100%) of the replacement cost of the Property (or, if less, the balance owing under the Note and the other Loan Documents). Such insurance policy or policies shall include rental income interruption coverage as more specifically described in Section 4.4.3 below. If any of the improvements on the Property are at any time located in a federally-designated special flood hazard area in which flood insurance is available, Borrower must provide Lender with flood insurance in an amount, and with deductibles, as specified by Lender. All policies of insurance on the Property, whether or not required by the terms of this Security Instrument (including but not limited to earthquake/earth movement insurance), shall name Lender as mortgagee and loss payee pursuant to a mortgage endorsement on a form acceptable to Lender, which form must provide that Lender will not have its interest voided by the act or omission of Borrower and that Lender may file a claim directly with the insurer (an "Acceptable Mortgage Endorsement"). Lender shall have the right to control or direct the proceeds of all such policies of insurance, whether or not required by the terms of this Security Instrument, as provided in Section 4.4.6 below, and all proceeds thereof are hereby assigned to Lender as security for the obligations secured by this Security Instrument. Each policy of insurance must have a deductible of an amount satisfactory to Lender in its sole discretion. Borrower shall be responsible for all uninsured losses and deductibles.

Loan No.: 625640141

4.4.2    **Liability**.  Borrower will maintain commercial general liability insurance on an occurrence form substantially equivalent to ISO form CG 0001 covering the legal liability of Borrower against claims occurring on, in, or about the Property with coverage of not less than One Million Dollars ($1,000,000) per occurrence, naming Lender an additional insured and having a deductible of an amount satisfactory to Lender in its sole discretion.

4.4.3    **Rental Income Interruption**.  Borrower will maintain rental income interruption insurance in an amount equal to at least twelve (12) months' gross rental income from the Property as determined by Lender from time to time, and naming Lender as loss payee on an Acceptable Mortgage Endorsement. The amount collected under any and all rental income interruption insurance on the Property, whether or not required by this Security Instrument, shall be applied as provided in Section 4.4.6.

4.4.4    **Changes in Insurance Requirements**.  Lender may change its insurance requirements from time to time throughout the term of the obligations secured by this Security Instrument by giving notice of such changes to Borrower. Without limiting the generality of the foregoing, Borrower shall from time to time obtain such additional coverages or make such increases in the amounts of existing coverage as may be required by written notice from Lender.

4.4.5    **General Provisions**.  All policies of insurance required to be maintained by Borrower pursuant to this Section 4.4 shall:  (i) be primary and noncontributory with any other insurance Borrower may carry; and (ii) be in form and substance and with companies acceptable to Lender which are authorized to conduct business in the state in which the Property is located and which have a current rating from the Best Key Rating Guide that is acceptable to Lender. Lender reserves the right, in its reasonable discretion, to increase the amount of the required coverages, require insurance against additional risks, or withdraw approval of any insurance company at any time. Borrower shall deliver to Lender evidence (in such form as Lender may require) of all insurance coverage on the Property and a certified copy of all policies of such insurance. Borrower shall obtain renewals or replacements of any policies that expire and deliver evidence of such renewals to Lender no later than the expiration date of the policy being renewed or replaced. All policies and renewals thereof shall contain provision for ten (10) days' notice to Lender prior to cancellation for nonpayment of premiums and thirty (30) days' notice to Lender prior to cancellation for any other reason. If Borrower fails to maintain insurance in accordance with this Security Instrument and the other Loan Documents, Lender may, but need not, obtain insurance on Borrower's behalf; this insurance is called "force placed insurance." For instance, without limitation, Lender may obtain force placed insurance if: (a) Borrower fails to deliver to Lender, prior to the expiration of any such required insurance coverage, evidence satisfactory to Lender that Borrower has renewed or replaced such coverage; (b) the amount of insurance is reduced below Lender's requirements; (c) the deductible is increased above Lender's requirements; or (d) the insurer providing the insurance does not meet Lender's insurance company rating requirements.  Unless Borrower provides Lender with evidence of the insurance coverage required by this Security Instrument, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Property. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Property. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Security Instrument. If Lender purchases insurance for the Property, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

Loan No.: 625640141

### 4.4.6    Damage and Destruction.

(a)    **Borrower's Obligations**. In the event of any damage to or loss or destruction of the Property (a "Casualty"): (i) if it could reasonably be expected to cost more than $25,000 to repair the Casualty, Borrower shall give prompt written notice of the Casualty to Lender and to Borrower's insurer, and shall make a claim under each insurance policy providing coverage therefor; (ii) Borrower shall take such actions as are necessary or appropriate to preserve and protect the Property; (iii) if the aggregate proceeds of any and all insurance policies insuring the Property, whether or not required by this Security Instrument, that are payable as a result of the Casualty (collectively, the "Insurance Proceeds") could reasonably be expected to exceed $25,000, or if a Default exists, Borrower shall take such actions as are necessary or appropriate to ensure that all Insurance Proceeds are paid to Lender forthwith to be held by Lender until applied to the obligations secured hereby or disbursed in accordance with this Section 4.4.6; and (iv) unless otherwise instructed by Lender, regardless of whether the Insurance Proceeds, if any, are sufficient for the purpose, Borrower shall promptly commence and diligently pursue to completion in a good, workmanlike and lien-free manner the restoration, replacement and rebuilding of the Property as nearly as possible to its value, condition and character immediately prior to the Casualty (collectively, the "Restoration"). If the Restoration will cost more than $25,000 to repair, Borrower shall submit the proposed plans and specifications for the Restoration, and all construction contracts, architect's contracts, other contracts in connection with the Restoration, and such other documents as Lender may reasonably request to Lender for its review and approval. Borrower shall not begin the Restoration unless and until Lender gives its written approval of such plans, specifications, contracts and other documents, with such revisions as Lender may reasonably require. Notwithstanding the foregoing, Lender shall not be responsible for the sufficiency, completeness, quality or legality of any such plans, specifications, contracts or other documents. Borrower shall pay, within ten days after demand by Lender, all costs reasonably incurred by Lender in connection with the adjustment, collection and disbursement of Insurance Proceeds pursuant to this Security Instrument or otherwise in connection with the Casualty or the Restoration.

(b)    **Lender's Rights**. Lender shall have the right and power to receive and control all Insurance Proceeds required to be paid to it pursuant to subsection (a)(iii) above. Borrower hereby authorizes and empowers Lender, in its own name or as attorney-in-fact for Borrower (which power is coupled with an interest and is irrevocable so long as this Security Interest remains of record), to make proof of loss, to settle, adjust and compromise any claim under insurance policies on the Property, to appear in and prosecute any action arising from such insurance policies, to collect and receive Insurance Proceeds, and to deduct therefrom Lender's expenses incurred in the adjustment, collection and disbursement of such Insurance Proceeds or otherwise in connection with the Casualty or the Restoration. Each insurance company concerned is hereby irrevocably authorized and directed to make payment of all Insurance Proceeds directly to Lender. Notwithstanding anything to the contrary, Lender shall not be responsible for any such insurance, the collection of any Insurance Proceeds, or the insolvency of any insurer.

(c)    **Application of Proceeds**. If, at any time while Lender holds any Insurance Proceeds, an Event of Default exists or Lender determines in its reasonable discretion that the security for the obligations secured hereby is impaired, Lender shall have the option, in its sole discretion, to apply the Insurance Proceeds to the obligations secured hereby in such order as Lender may determine (or to hold such proceeds for future application to those obligations). Without limiting the generality of the foregoing, Lender's security will be deemed to be impaired if: (i) an Event of Default exists; (ii) Borrower fails to satisfy any condition precedent to disbursement of Insurance Proceeds to pay the cost of the Restoration within a reasonable time; or (iii) Lender determines in its reasonable discretion that it could reasonably be expected that (A) Borrower will not have sufficient funds to complete the Restoration and timely pay all expenses of the Property and all payments due under the Note and the other Loan Documents through the completion of the Restoration and any leaseup period thereafter, (B) the

7

Loan No.: 625640141

rental income from the Property will be insufficient to timely pay all expenses of the Property and payments due under the Note and the other Loan Documents on an ongoing basis after completion of the Restoration, or (C) the Restoration cannot be completed at least two years prior to the maturity date of the Note and within one year after the date of the Casualty.

(d) **Disbursement of Proceeds.** If Lender is not entitled to apply the Insurance Proceeds to the obligations secured hereby, Lender (or at Lender's election, a disbursing or escrow agent selected by Lender and whose fees shall be paid by Borrower) shall disburse the Insurance Proceeds for the Restoration from time to time as the Restoration progresses, but only after satisfaction, at Borrower's expense, of such conditions precedent to such disbursements as Lender may reasonably require including but not limited to the following: (i) Borrower shall have delivered to Lender evidence reasonably satisfactory to Lender of the estimated cost of the Restoration; (ii) Lender shall have approved the plans, specifications and contracts for the Restoration as required by Section 4.4.6(a); (iii) Borrower shall have delivered to Lender funds in addition to the Insurance Proceeds in an amount sufficient in Lender's reasonable judgment to complete and fully pay for the Restoration; (iv) Borrower shall have delivered to Lender such building permits, other permits, architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, plats of survey and other evidence of cost, payment and performance as Lender may reasonably require and approve; and (v) if required by Lender, Borrower shall have entered into an agreement providing in greater detail for the Restoration, the disbursement of Insurance Proceeds and related matters. No payment made prior to the final completion of the Restoration shall exceed ninety percent of the value of the work performed and materials incorporated into the Property from time to time, as such value is determined by Lender in its reasonable judgment. Disbursements may, at Lender's election, be made on a percentage of completion basis or on such other basis as is acceptable to Lender. Disbursements shall be subject to Borrower's delivery of such lien waivers as Lender may require, and otherwise on terms and subject to conditions acceptable to Lender. From time to time after commencement of the Restoration, if so requested by Lender, Borrower shall deposit with Lender funds in excess of the Insurance Proceeds which, together with the Insurance Proceeds and all funds previously deposited with Lender in connection with the Restoration, must at all times be at least sufficient in the reasonable judgment of Lender to pay the entire unpaid cost of the Restoration. Funds so deposited by Borrower may at Lender's option be disbursed prior to the disbursement of Insurance Proceeds. Lender may retain a construction consultant to inspect the Restoration and related matters on Lender's behalf and to advise Lender with respect thereto and Borrower shall pay the cost thereof; provided that neither Borrower nor any other person or entity other than Lender shall have any right to rely on any inspection or advice of such consultant. Such consultant shall not be the agent of Lender and shall not have the power to bind Lender in any way. Any surplus Insurance Proceeds or other funds held by Lender pursuant to this Section 4.4.6 that may remain after payment of all costs of the Restoration shall be paid to Borrower (or to such other person or entity as Lender reasonably determines is entitled thereto) so long as no Default then exists. No interest shall be allowed to Borrower on account of any Insurance Proceeds or other funds held by Lender pursuant to this Section 4.4.6, but at Borrower's request, Lender will deposit such amounts into a blocked interest-bearing account with Lender over which Lender has sole possession, authority and control, in which Lender has a perfected first-priority security interest to secure the obligations secured by this Security Instrument, and otherwise on terms and conditions satisfactory to Lender in its sole discretion. Notwithstanding the above, if an Event of Default exists prior to full disbursement of the Insurance Proceeds and any other funds held by Lender pursuant to this Section 4.4.6, any undisbursed portion thereof may, at Lender's option, be applied against the obligations secured by this Security Instrument, whether or not then due, in such order and manner as Lender shall select.

(e) **Effect on the Indebtedness.** Any reduction in the obligations secured hereby resulting from the application of Insurance Proceeds or other funds pursuant to this subsection 4.4.6 shall be deemed to take effect only on the date of such application; provided that, if any

Page 8 of 23



Loan No.: 625640141

Insurance Proceeds are received after the Property is sold in connection with a judicial or nonjudicial foreclosure of this Security Instrument, or is transferred by deed in lieu of such foreclosure, notwithstanding any limitation on Borrower's liability contained herein or in the Note, the purchaser at such sale (or the grantee under such deed) shall have the right to receive and retain all such Insurance Proceeds and all unearned premiums for all insurance on the Property. No application of Insurance Proceeds or other funds to the obligations secured hereby shall result in any adjustment in the amount or due dates of installments due under the Note. No application of Insurance Proceeds to the obligations secured hereby shall, by itself, cure or waive any Default or any notice of default under this Security Instrument or invalidate any act done pursuant to such notice or result in the waiver of any collateral securing the Note.

4.5 **Right of Inspection**. Borrower shall permit Lender or its agents or independent contractors (including, but not limited to, appraisers, environmental consultants and construction consultants), at all reasonable times, to enter upon and inspect the Property.

4.6 **Compliance with Laws, Etc.; Preservation of Licenses**. Borrower shall comply in all material respects with (a) all laws, statutes, ordinances, rules, regulations, licenses, permits, approvals, orders, judgments and other requirements of governmental authorities relating to the Property or Borrower's use thereof, and (b) all easements, licenses and agreements relating to the Property or Borrower's use thereof. Borrower shall observe and comply with all requirements necessary to the continued existence and validity of all rights, licenses, permits, privileges, franchises and concessions relating to any existing or presently contemplated use of the Property, including but not limited to any zoning variances, special exceptions and nonconforming use permits.

4.7 **Further Assurances**. Borrower will, at its expense, from time to time execute and deliver any and all such instruments of further assurance and other instruments and do any and all such acts, or cause the same to be done, as Lender deems necessary or advisable to mortgage and convey the Property to Lender or to carry out more effectively the purposes of this Security Instrument.

4.8 **Legal Actions**. Borrower will appear in and defend any action or proceeding before any court or administrative body purporting to affect the security hereof or the rights or powers of Lender; and will pay all costs and expenses, including cost of evidence of title, title insurance premiums and any fees of attorneys, appraisers, environmental inspectors and others, incurred by Lender, in a reasonable sum, in any such action or proceeding in which Lender may appear, in any suit or other proceeding to foreclose this Security Instrument.

4.9 **Taxes, Assessments and Other Liens**. Borrower will pay prior to delinquency all taxes, assessments, encumbrances, charges, and liens with interest, on the Property or any part thereof, including but not limited to any tax on or measured by rents of the Property, the Note, this Security Instrument, or any obligation or part thereof secured hereby.

4.10    **Expenses**. Borrower will pay all costs, fees and expenses reasonably incurred by Lender in connection with this Security Instrument.

4.11    **Repayment of Expenditures**. Borrower will pay within five (5) days after written demand all amounts secured by this Security Instrument, other than principal of and interest on the Note, with interest from date of expenditure at the rate of interest borne by the Note and the repayment thereof shall be secured by this Security Instrument.

4.12    **Financial and Operating Information**. Within ninety (90) days after the end of each fiscal year of Borrower, Borrower shall furnish to Lender the following in such form as Lender may require: (a) an itemized statement of income and expenses for Borrower's operation of the Property for that fiscal year; and (b) a rent schedule for the Property showing the name of each tenant, and for each

*9*

Loan No.: 625640141

tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, all security deposits held (and the institution in which they are held) and any related information requested by Lender.

In addition, within twenty (20) days after written request by Lender, Borrower shall furnish to Lender such financial statements and other financial, operating and ownership information about the Property, Borrower, owners of equity interests in Borrower, and guarantors of the obligations secured hereby, as Lender may require.

If Borrower fails to provide Lender with any of the financial and operating information required to be provided under this Section within the time periods required under this Section and such failure continues after Lender has provided Borrower with thirty (30) days' notice and opportunity to cure such failure, Borrower shall pay to Lender, as liquidated damages for the extra expense in servicing the loan secured hereby, Five Hundred Dollars ($500) on the first day of the month following the expiration of such thirty (30)-day period and One Hundred Dollars ($100) on the first day of each month thereafter until such failure is cured. All such amounts shall be secured by this Security Instrument. Payment of such amounts shall not cure any Default or Event of Default resulting from such failure.

### 4.13   Sale, Transfer, or Encumbrance of Property.

(a)   **Encumbrances; Entity Changes.**  Except as otherwise provided below, Borrower shall not, without the prior written consent of Lender, further encumber the Property or any interest therein, or cause or permit any change in the entity, ownership, or control of Borrower without first repaying in full the Note and all other sums secured hereby.

(b)   **Sales, Transfers, Conveyances.**  Except as otherwise provided below, Borrower shall not, without the prior written consent of Lender (which consent shall be subject to the conditions set forth below), sell, transfer, or otherwise convey the Property or any interest therein, voluntarily or involuntarily, without first repaying in full the Note and all other sums secured hereby.

(c)   **Conditions to Lender's Consent.**  Lender will not unreasonably withhold its consent to a sale, transfer, or other conveyance of the Property, provided however, that:

(i)   Borrower shall provide to Lender a loan application on such form as Lender may require executed by the proposed transferee and accompanied by such other documents as Lender may require in connection therewith;

(ii)   Lender may consider the factors normally used by Lender as of the time of the proposed assumption in the process of determining whether or not to lend funds, and may require that the Property and the proposed transferee meet Lender's then-current underwriting requirements as of that time;

(iii)   Lender may specifically evaluate the financial responsibility, structure and real estate operations experience of any potential transferee;

(iv)   Lender may require that it be provided at Borrower's expense, with an appraisal of the Property, an on-site inspection of the Property, and such other documents and items, from appraisers, inspectors and other parties satisfactory to Lender, and may require that Borrower or the transferee of the Property correct any items of deferred maintenance that may be identified by Lender;

(v)   Lender may, as a condition to granting its consent to a sale, transfer, or other conveyance of the Property, require in its sole discretion the payment by Borrower of a fee (the "Consented Transfer Fee") of one percent (1%) of the unpaid principal balance of the Note; and

*10*

Loan No.: 625640141

                             (vi)     No Default or Event of Default (each as defined below) has occurred and is continuing.

In connection with any sale, transfer or other conveyance of the Property to which Lender is asked to consent, Borrower agrees to pay to Lender, in addition to any sums specified above, for Lender's expenses incurred in reviewing and evaluating such matter, the following amounts: (i) a nonrefundable review fee in accordance with Lender's fee schedule in effect at the time of the request, which fee shall be paid by Borrower to Lender upon Borrower's request for Lender's consent and shall be applied to the Consented Transfer Fee if Lender's consent is given to such sale, transfer, or other conveyance of the Property; (ii) Lender's reasonable attorneys' fees and other reasonable out-of-pocket expenses incurred in connection with such request for consent and in connection with such sale, transfer or other conveyance; and (iii) document preparation fees and other fees in accordance with Lender's fee schedule in effect at the time. In addition, prior to or at the time of any sale, transfer or other conveyance to which Lender grants its consent, Borrower shall obtain and provide to Lender a fully and duly executed and acknowledged assumption agreement in form and substance satisfactory to Lender under which the transferee of the Property assumes liability for the loan evidenced by the Note and secured by this Security Instrument together with such financing statements and other documents as Lender may require. Borrower and any guarantors of such loan shall continue to be obligated for repayment of such loan unless and until Lender has entered into a written assumption agreement specifically releasing them from such liability in Lender's sole discretion.

Consent to any one such occurrence shall not be deemed a waiver of the right to require consent to any future occurrences.

                             (d)     **Unconsented Transfers**. In each instance in which a sale, transfer or other conveyance of the Property, or any change in the entity, ownership, or control of Borrower, occurs without Lender's prior written consent thereto having been given, and regardless of whether Lender elects to accelerate the maturity date of the Note (any of the foregoing events is referred to as an "Unconsented Transfer"), Borrower and its successors shall be jointly and severally liable to Lender for the payment of a fee (the "Unconsented Transfer Fee") of two percent (2.0%) of the unpaid principal balance of the Note as of the date of such Unconsented Transfer. The Unconsented Transfer Fee shall be due and payable upon written demand therefor by Lender, and shall be secured by this Security Instrument; provided, however, that payment of the Unconsented Transfer Fee shall not cure any Event of Default resulting from the Unconsented Transfer.

                             (e)     **No Waiver**. Lender's waiver of any of the Consented Transfer Fee, the Unconsented Transfer Fee or any other amount payable hereunder, in whole or in part for any one sale, transfer or other conveyance shall not preclude the imposition thereof in connection with any other sale, transfer or other conveyance.

                             (f)     **Permitted Transfers**.    Notwithstanding the foregoing and notwithstanding Section 4.14, Lender's consent will not be required, and neither the Consented Transfer Fee nor the Unconsented Transfer Fee will be imposed, for any Permitted Transfer (as defined below), so long as all Transfer Requirements (as defined below) applicable to such Permitted Transfer are timely satisfied. As used herein, the following terms have the meanings set forth below:

"Permitted Transfer" means:

                             (i)     The transfer of not more than twenty-five percent (25%) in the aggregate during the term of the Note of the Equity Interests (as defined below) in Borrower (or in any entity that owns, directly or indirectly through one or more intermediate entities, an Equity Interest in Borrower), in addition to any transfers permitted under subparagraphs (ii) or (iii) of this definition (a "Minority Interest Transfer");

*//*

Loan No.: 625640141

(ii)    A transfer that occurs by devise, descent or operation of law upon the death of a natural person (a "Decedent Transfer"); or

(iii)    A transfer of interests in the Property, in Borrower or in any entity that owns, directly or indirectly through one or more intermediate entities, an Equity Interest in Borrower, to non-minor immediate family members (i.e., the parents, spouse, siblings, children and other lineal descendants, and the spouses of parents, siblings, children and other lineal descendants) of the transferor or to one or more trusts established for the benefit of the transferor and/or such immediate family members of the transferor (an "Estate Planning Transfer").

"Transfer Requirements" means, with respect to any Permitted Transfer, all of the following that apply to that transfer:

(i)    In the case of any Permitted Transfer, none of the persons or entities liable for the repayment of the loan evidenced by the Note shall be released from such liability.

(ii)    In the case of any Minority Interest Transfer or Estate Planning Transfer, there shall be no change in the individuals exercising day-to-day powers of decisionmaking, management and control over either Borrower or the Property unless Lender has given its prior written consent to such change in its sole discretion. In the case of a Decedent Transfer, any new individual exercising such powers must be satisfactory to Lender in its sole discretion.

(iii)    In the case of a Decedent Transfer, if the decedent was a Borrower or guarantor of the loan evidenced by the Note, within 30 days after written request by Lender, one or more other persons or entities having credit standing and financial resources equal to or better than those of the decedent, as determined by Lender in its reasonable discretion, shall assume or guarantee such loan by executing and delivering to Lender a guaranty or assumption agreement and a certificate and indemnity agreement regarding hazardous substances, each satisfactory to Lender, providing Lender with recourse substantially identical to that which Lender had against the decedent and granting Lender liens on any and all interests of the transferee in the Property.

(iv)    In the case of any Estate Planning Transfer that results in a transfer of an interest in the Property or in a change in the trustee of any trust owning an interest in the Property, the transferee or new trustee (in such new trustee's fiduciary capacity) shall, prior to the transfer, execute and deliver to Lender an assumption agreement satisfactory to Lender, providing Lender with recourse substantially identical to that which Lender had against the transferor or predecessor trustee and granting Lender liens on any and all interests of the transferee or the new trustee in the Property.

(v)    In the case of any Permitted Transfer that results in a transfer of an interest in the Property, Lender shall be provided, at no cost to Lender, with an endorsement to its title insurance policy insuring the lien of this Security Instrument, which endorsement shall insure that there has been no impairment of that lien or of its priority.

(vi)    In the case of any Permitted Transfer, Borrower or the transferee shall pay all costs and expenses reasonably incurred by Lender in connection with that Permitted Transfer, together with any applicable fees in accordance with Lender's fee schedule in effect at the time of the Permitted Transfer, and shall provide Lender with such information and documents as Lender reasonably requests in order to make the determinations called for by this Security Instrument and to comply with applicable laws, rules and regulations.

(vii)    No Default shall exist.

Loan No.: 625640141

"Equity_Interest" means partnership interests in Borrower, if Borrower is a partnership, member interests in Borrower, if Borrower is a limited liability company, or shares of stock of Borrower, if Borrower is a corporation.

4.14    **Borrower Existence.** If Borrower is a corporation, partnership, limited liability company or other entity, Lender is making this loan in reliance on Borrower's continued existence, ownership and control in its present form. Borrower will not alter its name, jurisdiction of organization, structure, ownership or control without the prior written consent of Lender and will do all things necessary to preserve and maintain said existence and to ensure its continuous right to carry on its business. If Borrower is a partnership, Borrower will not permit the addition, removal or withdrawal of any general partner without the prior written consent of Lender. The withdrawal or expulsion of any general partner from Borrower partnership shall not in any way affect the liability of the withdrawing or expelled general partner hereunder or on the Note.

4.15    **Information for Participants, Etc.** Borrower agrees to furnish such information and confirmation as may be required from time to time by Lender on request of potential loan participants and assignees and agrees to make adjustments in this Security Instrument, the Note, and the other documents evidencing or securing the loan secured hereby to accommodate such participant's or assignee's requirements, provided that such requirements do not vary the economic terms of the loan secured hereby. Borrower hereby authorizes Lender to disclose to potential participants and assignees any information in Lender's possession with respect to Borrower and the loan secured hereby.

4.16    **Tax and Insurance Impounds.**

(a)    **Impounds.** In addition to the payments required by the Note, Borrower agrees to pay Lender, at Lender's request, such sums as Lender may from time to time estimate will be required to pay, at least one month before delinquency, the next due taxes, assessments, insurance premiums, and similar charges affecting the Property, less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such taxes, assessments and premiums will become delinquent, such sums to be held by Lender without interest or other income to Borrower to pay such taxes, assessments and premiums. Should this estimate as to taxes, assessments and premiums prove insufficient, Borrower upon demand agrees to pay Lender such additional sums as may be required to pay them before delinquent.

(b)    **Application.** If the total of the payments described in subsection (a) of this Section (collectively, the "Impounds") in any one year shall exceed the amounts actually paid by Lender for taxes, assessments and premiums, such excess may be credited by Lender on subsequent payments under this section. At any time after the occurrence and during the continuance of an Event of Default and at or prior to the foreclosure sale, Lender may apply any balance of funds it may hold pursuant to this Section to any amount secured by this Security Instrument and in such order as Lender may elect. If Lender does not so apply such funds at or prior to the foreclosure sale, the purchaser at such sale shall be entitled to all such funds. If Lender acquires the Property in lieu of realizing on this Security Instrument, the balance of funds it holds shall become the property of Lender. Any transfer in fee of all or a part of the Property shall automatically transfer to the grantee all or a proportionate part of Borrower's rights and interest in the fund accumulated hereunder.

(c)    **Tax Reporting Service.** Lender may, but need not, contract with a tax reporting service covering the Property. Borrower agrees that Lender may rely on the information furnished by such tax service and agrees to pay the cost of that service within 30 days after receipt of a billing for it.

(d)    **Limited Waiver.** Notwithstanding the foregoing, Lender will not require Borrower to deposit the Impounds as provided in subsection (a) of this Section so long as: (i) the

Loan No.: 625640141

Property is owned in its entirety by the original Borrower named below (and not by any successor or transferee Borrower) and there is no change in the individuals exercising day-to-day powers of decisionmaking, management and control over either Borrower or the Property (regardless of whether Lender has consented to any such transfer or change); (ii) Borrower pays, prior to delinquency, all payments of taxes, assessments, insurance premiums and other amounts that would otherwise be paid from the Impounds and, if required by Lender, Borrower provides Lender with proof of such payment; and (iii) no Event of Default occurs (regardless of whether it is later cured). If at any time Borrower fails to meet any of the foregoing requirements, Lender may at any time thereafter require the payment of all Impounds upon ten days written notice to Borrower.

     4.17    **Leases, Security Deposits, Etc**.  Borrower shall not receive or collect any rents from any present or future tenant of the Property or any part thereof in advance in excess of one (1) month's rent or collect a security deposit in excess of two (2) months' rent. Borrower shall promptly deposit and maintain all security deposits and other deposits received by Borrower from tenants in a segregated trust account in a federally insured institution. Borrower shall perform its obligations under the Leases in all material respects.

     4.18    **Condominium and Cooperative Provisions**.  If the Property is not subject to a recorded condominium or cooperative regime on the date of this Security Instrument, Borrower will not subject the Property or any portion thereof to such a regime without the written consent of Lender, which consent may be granted or denied in Lender's sole discretion and, if granted, may be subject to such requirements as Lender may impose including but not limited to Borrower providing Lender with such title insurance endorsements and other documents as Lender may require. If the Property is subject to a condominium regime on the date of this Security Instrument:  (a) Borrower represents and warrants that none of the condominium units and no portion of the common elements in the Property have been sold, conveyed or encumbered or are subject to any agreement to convey or encumber; (b) Borrower shall not in any way sell, convey or encumber or enter into a contract or agreement to sell, convey or encumber any condominium unit or any of the common elements of the Property unless expressly agreed to in writing by Lender; (c) Borrower shall operate the Property solely as a rental property; and (d) the Property granted, conveyed and assigned to Lender hereunder includes all rights, easements, rights of way, reservations and powers of Borrower, as owner, declarant or otherwise, under any applicable condominium act or statute and under any and all condominium declarations, survey maps and plans, association articles and bylaws and documents similar to any of the foregoing.

     4.19    **Use of Property; Zoning Changes**.    Unless required by applicable law, Borrower shall not:  (a) except for any change in use approved by Lender in writing, allow changes in the use for which all or any part of the Property is being used at the time this Security Instrument is executed; (b) convert any individual dwelling unit or common area in the Property to primarily commercial use; or (c) initiate or acquiesce in a change in the zoning classification of the Property.

    5.    **DEFAULT**.

     5.1  **Definition**.  Any of the following shall constitute an "Event of Default" as that term is used in this Security Instrument (and the term "Default" shall mean any of the following, whether or not any requirement for notice or lapse of time has been satisfied):

        (a)    Any regular monthly payment under the Note is not paid so that it is received by Lender within fifteen (15) days after the date when due, or any other amount secured by this Security Instrument (including but not limited to any payment of principal or interest due on the Maturity Date, as defined in the Note) is not paid so that it is received by Lender when due;

        (b)    Any representation or warranty made by Borrower to or for the benefit of Lender herein or elsewhere in connection with the loan secured hereby, including but not

*14*

Loan No.: 625640141

limited to any representation in connection with the security therefor, shall prove to have been incorrect or misleading in any material respect;

        (c)    Borrower or any other party thereto (other than Lender) shall fail to perform its obligations under any other covenant or agreement contained in this Security Instrument, the Note, any other Loan Document or the Indemnity Agreement, which failure continues for a period of thirty (30) days after written notice of such failure by Lender to Borrower, but no such notice or cure period shall apply in the case of: (i) any such failure that could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Security Instrument, the other Loan Documents or the Indemnity Agreement, result in harm to Lender, impairment of the Note or this Security Instrument or any other security given under any other Loan Document; (ii) any such failure that is not reasonably susceptible of being cured during such 30-day period; (iii) breach of any provision that contains an express cure period; or (iv) any breach of Section 4.13 or Section 4.14 of this Security Instrument;

        (d)    Borrower or any other person or entity liable for the repayment of the indebtedness secured hereby shall become unable or admit in writing its inability to pay its debts as they become due, or file, or have filed against it, a voluntary or involuntary petition in bankruptcy, or make a general assignment for the benefit of creditors, or become the subject of any other receivership or insolvency proceeding, provided that if such petition or proceeding is not filed or acquiesced in by Borrower or the subject thereof, it shall constitute an Event of Default only if it is not dismissed within sixty (60) days after it is filed or if prior to that time the court enters an order substantially granting the relief sought therein;

        (e)    Borrower or any other signatory thereto shall default in the performance of any covenant or agreement contained in any mortgage, deed of trust or similar security instrument encumbering the Property, or the note or any other agreement evidencing or securing the indebtedness secured thereby, which default continues beyond any applicable cure period;

        (f)    A tax, charge or lien shall be placed upon or measured by the Note, this Security Instrument, or any obligation secured hereby that Borrower does not or may not legally pay in addition to the payment of all principal and interest as provided in the Note; or

        (g)    There shall occur any default under the Indemnity Agreement.

    5.2  **Lender's Right to Perform**.  After the occurrence and during the continuance of any Event of Default, Lender, but without the obligation so to do and without notice to or demand upon Borrower and without releasing Borrower from any obligations hereunder, may: make any payments or do any acts required of Borrower hereunder in such manner and to such extent as either may deem necessary to protect the security hereof, Lender being authorized to enter upon the Property for such purposes; commence, appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Lender; pay, purchase, contest or compromise any encumbrance, charge or lien in accordance with the following paragraph; and in exercising any such powers, pay necessary expenses, employ counsel and pay a reasonable fee therefor. All sums so expended shall be payable on demand by Borrower, be secured hereby and bear interest at the Default Rate of interest specified in the Note from the date advanced or expended until repaid.

    Lender, in making any payment herein, is hereby authorized, in the place and stead of Borrower, in the case of a payment of taxes, assessments, water rates, sewer rentals and other governmental or municipal charges, fines, impositions or liens asserted against the Property, to make such payment in reliance on any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of the bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof; in the case of any apparent or threatened adverse claim of title, lien, statement of lien, encumbrance, deed of trust, mortgage, claim or charge Lender shall be the sole judge of



Loan No.: 625640141

the legality or validity of same; and in the case of a payment for any other purpose herein and hereby authorized, but not enumerated in this paragraph, such payment may be made whenever, in the sole judgment and discretion of Lender such advance or advances shall seem necessary or desirable to protect the full security intended to be created by this Security Instrument, provided further, that in connection with any such advance, Lender at its option may and is hereby authorized to obtain a continuation report of title prepared by a title insurance company, the cost and expenses of which shall be repayable by Borrower without demand and shall be secured hereby.

5.3 **Remedies on Default**. Upon the occurrence of any Event of Default all sums secured hereby shall become immediately due and payable, without notice or demand, at the option of Lender and Lender may:

(a)    Have a receiver appointed as a matter of right on an *ex parte* basis without notice to Borrower and without regard to the sufficiency of the Property or any other security for the indebtedness secured hereby and, without the necessity of posting any bond or other security. Such receiver shall take possession and control of the Property and shall collect and receive the Rents. If Lender elects to seek the appointment of a receiver for the Property, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. The receiver shall be entitled to receive a reasonable fee for managing the Property, which fee may be deducted from the Rents or may be paid by Lender and added to the indebtedness secured by this Security Instrument. Immediately upon appointment of a receiver, Borrower shall surrender possession of the Property to the receiver and shall deliver to the receiver all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Property and all security deposits. If the Rents are not sufficient to pay the costs of taking control of and managing the Property and collecting the Rents, any funds expended by Lender, or advanced by Lender to the receiver, for such purposes shall become an additional part of the indebtedness secured by this Security Instrument. The receiver may exclude Borrower and its representatives from the Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 5.3 shall not be construed to make Lender a mortgagee-in-possession of the Property so long as Lender has not itself entered into actual possession of the Property.

(b)    Foreclose this Security Instrument as provided in Section 7 or otherwise realize upon the Property as permitted under applicable law.

(c)    Exercise any power of sale permitted pursuant to applicable law.

(d)    Sue on the Note as permitted under applicable law.

(e)    Avail itself of any other right or remedy available to it under the terms of this Security Instrument, the other Loan Documents or applicable law.

5.4 **No Waiver**. By accepting payment of any sum secured hereby after its due date, Lender does not waive its right either to require prompt payment when due of all other sums so secured or to declare an Event of Default for failure to do so.

5.5 **Waiver of Marshaling, Etc**. In connection with any foreclosure sale under this Security Instrument, Borrower hereby waives, for itself and all others claiming by, through or under Borrower, any right Borrower or such others would otherwise have to require marshaling or to require that the Property be sold in parcels or in any particular order.

5.6 **Remedies Cumulative; Subrogation**. The rights and remedies accorded by this Security Instrument shall be in addition to, and not in substitution of, any rights or remedies available

*16*

Loan No.: 625640141

under now existing or hereafter arising applicable law. All rights and remedies provided for in this Security Instrument or afforded by law or equity are distinct and cumulative and may be exercised concurrently, independently or successively. The failure on the part of Lender to promptly enforce any right hereunder shall not operate as a waiver of such right and the waiver of any Default or Event of Default shall not constitute a waiver of any subsequent or other Default or Event of Default. Lender shall be subrogated to the claims and liens of those whose claims or liens are discharged or paid with the loan proceeds hereof.

6.  **CONDEMNATION, ETC.** Any and all awards of damages, whether paid as a result of judgment or prior settlement, in connection with any condemnation or other taking of any portion of the Property for public or private use, or for injury to any portion of the Property ("Awards"), are hereby assigned and shall be paid to Lender which may apply or disburse such Awards in the same manner, on the same terms, subject to the same conditions, to the same extent, and with the same effect as provided in Section 4.4.6 above for disposition of Insurance Proceeds. Without limiting the generality of the foregoing, if the taking results in a loss of the Property to an extent that, in the reasonable opinion of Lender, renders or is likely to render the Property not economically viable or if, in Lender's reasonable judgment, Lender's security is otherwise impaired, Lender may apply the Awards to reduce the unpaid obligations secured hereby in such order as Lender may determine, and without any adjustment in the amount or due dates of installments due under the Note. If so applied, any Awards in excess of the unpaid balance of the Note and other sums due to Lender shall be paid to Borrower or Borrower's assignee. Lender shall in no case be obligated to see to the proper application of any amount paid over to Borrower. Such application or release shall not cure or waive any Default or notice of default hereunder or invalidate any act done pursuant to such notice. Should the Property or any part or appurtenance thereof or right or interest therein be taken or threatened to be taken by reason of any public or private improvement, condemnation proceeding (including change of grade), or in any other manner, Lender may, at its option, commence, appear in and prosecute, in its own name, any action or proceeding, or make any reasonable compromise or settlement in connection with such taking or damage, and obtain all Awards or other relief therefor, and Borrower agrees to pay Lender's costs and reasonable attorneys' fees incurred in connection therewith. Lender shall have no obligation to take any action in connection with any actual or threatened condemnation or other proceeding.

7.  **SPECIAL ILLINOIS PROVISIONS.**

7.1  **Illinois Mortgage Foreclosure Law.** It is the intention of Borrower and Lender that the enforcement of the terms and provisions of this Security Instrument shall be accomplished in accordance with the Illinois Mortgage Foreclosure Law (the "Act"), Illinois Compiled Statutes, 735 ILCS 5/15-1101 *et seq.* and with respect to such Act, Borrower agrees and covenants that:

(a)     Borrower and Lender shall have the benefit of all of the provisions of the Act, including all amendments thereto which may become effective from time to time after the date hereof. In the event any provision of the Act which is specifically referred to herein may be repealed, Lender shall have the benefit of such provision as most recently existing prior to such repeal, as though the same were incorporated herein by express reference;

(b)     Wherever provision is made in this Security Instrument for insurance policies to bear mortgage clauses or other loss payable clauses or endorsements in favor of Lender, or to confer authority upon Lender to settle or participate in the settlement of losses under policies of insurance or to hold and disburse or otherwise control use of insurance proceeds, from and after the entry of judgment of foreclosure, all such rights and powers of Lender shall continue in Lender as judgment creditor or mortgagee until confirmation of sale;

*17*

Loan No.: 625640141

(c)    All advances, disbursements and expenditures made or incurred by Lender before and during a foreclosure, and before and after judgment of foreclosure, and at any time prior to sale, and, where applicable, after sale, and during the pendency of any related proceedings, for the following purposes, in addition to those otherwise authorized by this Security Instrument, or by the Act (collectively "Protective Advances"), shall have the benefit of all applicable provisions of the Act, including those provisions of the Act referred to below:

(i)    all advances by Lender in accordance with the terms of this Security Instrument to: (1) preserve, maintain, repair, restore or rebuild the improvements upon the Property; (2) preserve the lien of this Security Instrument or the priority thereof; or (3) enforce this Security Instrument, as referred to in Subsection (b)(5) of Section 5/15-1302 of the Act;

(ii)    payments by Lender of (1) principal, interest or other obligations in accordance with the terms of any senior mortgage or other prior lien or encumbrance; (2) real estate taxes and assessments, general and special and all other taxes and assessments of any kind or nature whatsoever which are assessed or imposed upon the Property or any part thereof; (3) other obligations authorized by this Security Instrument; or (4) with court approval, any other amounts in connection with other liens, encumbrances or interests reasonably necessary to preserve the status of title, as referred to in Section 5/15-1505 of the Act;

(iii)    advances by Lender in settlement or compromise of any claims asserted by claimants under senior mortgages or any other prior liens;

(iv)    attorneys' fees and other costs incurred: (1) in connection with the foreclosure of this Security Instrument as referred to in Section 5/15-1504(d)(2) and 5/15-1510 of the Act; (2) in connection with any action, suit or proceeding brought by or against Lender for the enforcement of this Security Instrument or arising from the interest of Lender hereunder; or (3) in preparation for or in connection with the commencement, prosecution or defense of any other action related to this Security Instrument or the Property;

(v)    Lender's fees and costs, including attorneys' fees, arising between the entry of judgment of foreclosure and the confirmation hearing as referred to in Section 5/15-1508(b)(1) of the Act;

(vi)    expenses deductible from proceeds of sale as referred to in Section 5/15-1512(a) and (b) of the Act;

(vii)    expenses incurred and expenditures made by Lender for any one or more of the following: (1) if the Property or any portion thereof constitutes one or more units under a condominium declaration, assessments imposed upon the unit owner thereof; (2) if Borrower's interest in the Property is a leasehold estate under a lease or sublease, rentals or other payments required to be made by the lessee under the terms of the lease or sublease; (3) premiums for casualty and liability insurance paid by Lender whether or not Lender or a receiver is in possession, if reasonably required, in reasonable amounts, and all renewals thereof, without regard to the limitation to maintenance of existing insurance in effect at the time any receiver or Lender takes possession of the Property imposed by Section 5/15-1704(c)(1) of the Act; (4) repair or restoration of damage or destruction in excess of available insurance proceeds or condemnation awards; (5) payments deemed by Lender to be required for the benefit of the Property or required to be made by the owner of the Property under any grant or declaration of easement, easement agreement, agreement with any adjoining land owners or instruments creating covenants or restrictions for the benefit of or affecting the Property; (6) shared or common expense assessments payable to any association or corporation in which the owner of the Property is a member in any way affecting the Property; (7) if the loan secured hereby is a construction loan, costs incurred by Lender for demolition, preparation for and completion of construction, as may be authorized

*18*

Loan No.: 625640141

by the applicable commitment, loan agreement or other agreement; (8) payments required to be paid by Borrower or Lender pursuant to any lease or other agreement for occupancy of the Property and (9) if this Security Instrument is insured, payment of FHA or private mortgage insurance required to keep such insurance in force.

All Protective Advances shall be so much additional indebtedness secured by this Security Instrument, and shall become immediately due and payable without notice and with interest thereon from the date of the advance until paid at the Default Rate of interest specified in the Note.

This Security Instrument shall be a lien for all Protective Advances as to subsequent purchasers and judgment creditors from the time this Security Instrument is recorded pursuant to Subsection (b)(5) of Section 5/15-1302 of the Act.

All Protective Advances shall, except to the extent, if any, that any of the same is clearly contrary to or inconsistent with the provisions of the Act, apply to and be included in:

(A) any determination of the amount of indebtedness secured by this Security Instrument at any time;

(B) the indebtedness found due and owing to Lender in the judgment of foreclosure and any subsequent supplemental judgments, orders, adjudications or findings by the court of any additional indebtedness becoming due after such entry of judgment, it being agreed that in any foreclosure judgment, the court may reserve jurisdiction for such purpose;

(C) if right of redemption has not been waived by this Security Instrument, computation of amounts required to redeem pursuant to Sections 5/15-1603(d) and 5/15-1603(e) of the Act;

(D) determination of amounts deductible from sale proceeds pursuant to Section 5/15-1512 of the Act;

(E) application of income in the hands of any receiver or mortgagee in possession; and

(F) computation of any deficiency judgment pursuant to Section 5/15-1508(b)(2), 5/15-1508(e) and 5/15-1511 of the Act;

(d)     In addition to any provision of this Security Instrument authorizing Lender to take or be placed in possession of the Property, or for the appointment of a receiver, Lender shall have the right, in accordance with Section 5/15-1701 and 5/15-1702 of the Act, to be placed in possession of the Property or at its request to have a receiver appointed, and such receiver, or Lender, if and when placed in possession, shall have, in addition to any other powers provided in this Security Instrument, all rights, powers, immunities, and duties as provided for in Sections 5/15-1701 and 5/15-1703 of the Act; and

(e)     Borrower acknowledges that the Property does not constitute agricultural real estate, as said term is defined in Section 5/15-1201 of the Act or residential real estate as defined in Section 5/15-1219 of the Act. Pursuant to Section 5/15-1601(b) of the Act, Borrower hereby waives any and all right of redemption from the sale under any order or judgment of foreclosure of this Security Instrument or under any sale or statement or order, decree or judgment of any court relating to this Security Instrument, on behalf of itself and each and every person acquiring any interest in or title to any portion of the Property, it being the intent hereof that any and all such rights of redemption of Borrower and of all such other persons are and shall be deemed to be hereby waived to the maximum extent and with the maximum effect permitted by the laws of the State of Illinois.

*19*

Loan No.: 625640141

7.2 **UCC Remedies.** Lender shall have the right to exercise any and all rights of a secured party under the UCC with respect to all or any part of the Property which may be personal property. Whenever notice is permitted or required hereunder or under the UCC, ten (10) days notice shall be deemed reasonable. Lender may postpone any sale under the UCC from time to time, and Borrower agrees that Lender shall have the right to be a purchaser at any such sale.

7.3 **Future Advances; Revolving Credit.** To the extent, if any, that Lender is obligated to make future advances of loan proceeds to or for the benefit of Borrower, Borrower acknowledges and intends that all such advances, including future advances whenever hereafter made, shall be a lien from the time this Security Instrument is recorded, as provided in Section 5/15-1302(b)(1) of the Act, and Borrower acknowledges that such future advances constitute revolving credit indebtedness secured by a mortgage on real property pursuant to the terms and conditions of 205 ILCS 5/5d. Borrower covenants and agrees that this Security Instrument shall secure the payment of all loans and advances made pursuant to the terms and provisions of the Note and this Security Instrument, whether such loans and advances are made as of the date hereof or at any time in the future, and whether such future advances are obligatory or are to be made at the option of Lender or otherwise (but not advances or loans made more than 20 years after the date hereof), to the same extent as if such future advances were made on the date of the execution of this Security Instrument and although there may be no advances made at the time of the execution of this Security Instrument and although there may be no other indebtedness outstanding at the time any advance is made. The lien of this Security Instrument shall be valid as to all Indebtedness, including future advances, from the time of its filing of record in the office of the Recorder of Deeds of the County in which the Property is located. The total amount of the indebtedness may increase or decrease from time to time. This Security Instrument shall be valid and shall have priority over all subsequent liens and encumbrances, including statutory liens except taxes and assessments levied on the Property, to the extent of the maximum amount secured hereby.

7.4 **Business Loan.** The proceeds of the indebtedness evidenced by the Note shall be used solely for business purposes and in furtherance of the regular business affairs of Borrower, and the entire principal obligation secured hereby constitutes (a) a "business loan" as that term is defined in, and for all purposes of, 815 ILCS 205/4(1)(c), and (b) a "loan secured by a mortgage on real estate" within the purview and operation of 815 ILCS 205/4(1)(1).

8. **NOTICES.**

8.1 **Borrower and Lender.** Any notice to or demand upon Borrower (including any notice of default or notice of sale) or notice to or demand upon Lender shall be deemed to have been sufficiently made for all purposes when deposited in the United States mails, postage prepaid, registered or certified, return receipt requested, addressed to Borrower at its address set forth above or to Lender at the following address:

> Washington Mutual Bank
> National Commercial Operations Center
> P.O. Box 9178
> Coppell, Texas  75019-9178
> Attention:  Portfolio Administration

or to such other address as the recipient may have directed by notice in accordance herewith.

8.2 **Waiver of Notice.** The giving of notice may be waived in writing by the person or persons entitled to receive such notice, either before or after the time established for the giving of such notice.

20

Loan No.: 625640141

9. **MODIFICATIONS, ETC.** Each person or entity now or hereafter owning any interest in the Property agrees, by executing this Security Instrument or taking the Property subject to it, that Lender may in its sole discretion and without notice to or consent of any such person or entity: (i) extend the time for payment of the obligations secured hereby; (ii) discharge or release any one or more parties from their liability for such obligations in whole or in part; (iii) delay any action to collect on such obligations or to realize on any collateral therefor; (iv) release or fail to perfect any security for such obligations; (v) consent to one or more transfers of the Property, in whole or in part, on any terms; (vi) waive or release any of holder's rights under any of the Loan Documents; (vii) agree to an increase in the amount of such obligations or to any other modification of such obligations or of the Loan Documents; or (viii) proceed against such person or entity before, at the same time as, or after it proceeds against any other person or entity liable for such obligations.

10. **SUCCESSORS AND ASSIGNS.** All provisions herein contained shall be binding upon and inure to the benefit of the respective successors and assigns of the parties.

11. **GOVERNING LAW; SEVERABILITY.** This Security Instrument shall be governed by the law of the state of Illinois. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, the conflict shall not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision and to this end the provisions of this Security Instrument and the Note are declared to be severable.

12. **BORROWER'S RIGHT TO POSSESSION.** Borrower may be and remain in possession of the Property for so long as no Event of Default exists and Borrower may, while it is entitled to possession of the Property, use the same.

13. **MAXIMUM INTEREST.** No provision of this Security Instrument or of the Note shall require the payment or permit the collection of interest in excess of the maximum permitted by law. If any excess of interest in such respect is herein or in the Note provided for, neither Borrower nor its successors or assigns shall be obligated to pay that portion of such interest that is in excess of the maximum permitted by law, and the right to demand the payment of any such excess shall be and is hereby waived and this Section 13 shall control any provision of this Security Instrument or the Note that is inconsistent herewith.

14. **ATTORNEYS' FEES AND LEGAL EXPENSES.** In the event of any Default under this Security Instrument, or in the event that any dispute arises relating to the interpretation, enforcement or performance of any obligation secured by this Security Instrument, Lender shall be entitled to collect from Borrower on demand all fees and expenses incurred in connection therewith, including but not limited to fees of attorneys, accountants, appraisers, environmental inspectors, consultants, expert witnesses, arbitrators, mediators and court reporters. Without limiting the generality of the foregoing, Borrower shall pay all such costs and expenses incurred in connection with:  (a) arbitration or other alternative dispute resolution proceedings, trial court actions and appeals; (b) bankruptcy or other insolvency proceedings of Borrower, any guarantor or other party liable for any of the obligations secured by this Security Instrument or any party having any interest in any security for any of those obligations; (c) judicial or nonjudicial foreclosure on, or appointment of a receiver for, any of the Property; (d) post-judgment collection proceedings; (e) all claims, counterclaims, cross-claims and defenses asserted in any of the foregoing whether or not they arise out of or are related to this Security Instrument; (f) all preparation for any of the foregoing; and (g) all settlement negotiations with respect to any of the foregoing.

15. **PREPAYMENT PROVISIONS.** If at any time after an Event of Default and acceleration of the indebtedness secured hereby there shall be a tender of payment of the amount necessary to satisfy such indebtedness by or on behalf of Borrower, its successors or assigns, the same shall be deemed to be a

Loan No.: 625640141

voluntary prepayment such that the sum required to satisfy such indebtedness in full shall include, to the extent permitted by law, the additional payment required under the prepayment privilege as stated in the Note.

16. **TIME IS OF THE ESSENCE.** Time is of the essence under this Security Instrument and in the performance of every term, covenant and obligation contained herein.

17. **FIXTURE FILING.** This Security Instrument constitutes a financing statement, filed as a fixture filing in the real estate records of the county of the state in which the real property described in Exhibit A is located, with respect to any and all fixtures included within the list of improvements and fixtures described in Section 1.2 of this Security Instrument and to any goods or other personal property that are now or hereafter will become a part of the Property as fixtures.

18. **MISCELLANEOUS.**

18.1     Whenever the context so requires the singular number includes the plural herein, and the impersonal includes the personal.

18.2     The headings to the various sections have been inserted for convenient reference only and shall not modify, define, limit or expand the express provisions of this Security Instrument.

18.3     This Security Instrument, the Note and the other Loan Documents constitute the final expression of the entire agreement of the parties with respect to the transactions set forth therein. No party is relying upon any oral agreement or other understanding not expressly set forth in the Loan Documents. The Loan Documents may not be amended or modified except by means of a written document executed by the party sought to be charged with such amendment or modification.

18.4     No creditor of any party to this Security Instrument and no other person or entity shall be a third party beneficiary of this Security Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (a) any arrangement (a "Servicing Arrangement") between Lender and any servicer of the loan secured hereby for loss sharing or interim advancement of funds shall constitute a contractual obligation of such servicer that is independent of the obligation of Borrower for the payment of the indebtedness secured hereby, (b) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (c) no payment by a servicer under any Servicing Arrangement will reduce the amount of the indebtedness secured hereby.

19. **WAIVER OF JURY TRIAL. EACH OF BORROWER AND LENDER (FOR ITSELF AND ITS SUCCESSORS, ASSIGNS AND PARTICIPANTS) WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THIS SECURITY INSTRUMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS PROVIDED FOR HEREIN OR THEREIN, IN ANY LEGAL ACTION OR PROCEEDING OF ANY TYPE BROUGHT BY ANY PARTY TO ANY OF THE FOREGOING AGAINST ANY OTHER SUCH PARTY, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT SITTING WITHOUT A JURY.**

*[Remainder of this page intentionally left blank]*

Loan No.: 625640141

DATED as of the day and year first above written.

PLEASE SEE ATTACHED FOR ADDITIONAL SIGNATURE

Page 23 of 23

23

Loan No. 625640141

SIGNATURE PAGE

*n/k/a NORSTATES BANK*

**Bank of Waukegan as Trustee under Trust Agreement dated August 23, 2002 and known as Trust Number 204453** *AND NOT PERSONALLY OR INDIVIDUALLY*

*Barbara Richter  n/k/a NORSTATES BANK*
**By: Bank of Waukegan as Trustee under Trust Agreement dated August 23, 2002 and known as Trust Number 204453** *AND NOT PERSONALLY OR INDIVIDUALLY*

RIDER ATTACHED HERETO IS EXPRESSLY
MADE A PART HEREOF
*AS Exhibit "B"*

24

Loan No.: 625640141

## EXHIBIT A

### LEGAL DESCRIPTION

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

P.I.N.: _____

Street Address: _____

_____

EXHIBIT A

*25*



# CHICAGO TITLE INSURANCE COMPANY

**ORDER NUMBER:** 1409  000722104 VH
**STREET ADDRESS:** 927 GRAND AVENUE
**CITY:** WAUKEGAN                    **COUNTY:** LAKE
**TAX NUMBER:** 08-21-117-012-0000

**LEGAL DESCRIPTION:**

THAT PART OF LOT 23 IN ADDITION TO NORTHWEST ADDITION TO LITTLE FORT (NOW CITY
OF WAUKEGAN) AND THAT PART OF LOT 26 OF ASSESSOR'S SUBDIVISION OF PART OF TNE
NORTHWEST 1/4 OF SECTION 21, TOWNSHIP 45 NORTH, RANGE 12 EAST OF THE THIRD
PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED NOVEMBER 13, 1846 IN
BOOK "F" OF DEEDS, PAGE 467, BOUNDED BY A LINE DESCRIBED AS FOLLOWS:  TO WIT:
COMMENCING AT A POINT ON THE NORTHEASTERLY LINE OF SAID LOT 23, 2 RODS
SOUTHEASTERLY FROM THE MOST NORTHERLY CORNER OF SAID LOT 23; THENCE
SOUTHWESTERLY PARALLEL WITH NORTHWESTERLY LINE OF SAID LOT 23 AND SAID
NORTHWESTERLY LINE EXTENDED SOUTHWESTERLY TO A POINT 14 RODS SOUTHWESTERLY OF
THE SOUTHWESTERLY LINE OF SAID LOT 23; THENCE SOUTHEASTERLY PARALLEL WITH
SOUTHWESTERLY LINE OF SAID LOT 23, 5 RODS; THENCE NORTHEASTERLY PARALLEL WITH
SAID NORTHWESTERLY LINE OF SAID LOT 23 AND SAID LINE EXTENDED 18 RODS; THENCE
NORTHWESTERLY PARALLEL WITH SOUTHWESTERLY LINE OF SAID LOT 23, 17 1/2 FEET;
THENCE NORTHEASTERLY PARALLEL WITH NORTHWESTERLY LINE OF SAID LOT 23, 12 RODS TO
SOUTHWESTERLY LINE OF GRAND AVENUE; AND THENCE NORTHWESTERLY TO THE POINT OF
BEGINNING (EXCEPT THAT PART THEREOF FALLING IN THE SOUTHERLY 231.0 FEET OF LOT
66, IN COUNTY CLERK'S PLAT OF UNSUBDIVIDED LANDS IN WEST 1/2 OF SECTION 21,
TOWNSHIP AND RANGE AFORESAID, CONVEYED TO CITY OF WAUKEGAN, A MUNICIPAL
CORPORATION BY WARRANTY DEED DATED MARCH 21, 1925 AND RECORDED MAY 2, 1925 AS
DOCUMENT 256640, IN BOOK 271 OF DEEDS, PAGE 394), IN LAKE COUNTY, ILLINOIS.

Exhibit "B"

## TRUSTEE'S EXONERATION RIDER

This MORTGAGE is executed by the BANK OF WAUKEGAN N/K/A **NORSTATES BANK**, not personally or individually, but as Trustee under Trust Agreement dated August 23, 2002 and known as Trust No. 204453 in the exercise of the power and authority conferred upon and vested in it as such Trustee. It is expressly understood and agreed by the instrument herein and by every personal now or hereafter claiming any right or security hereunder that nothing contained herein or in the NOTE secured by this instrument shall be construed as creating any liability on BANK OF WAUKEGAN N/K/A **NORSTATES BANK** personally to pay said NOTE or any interest that may accrue hereunder, or any indebtedness accruing hereunder or to perform any covenants either express or implied herein contained, including any environmental conditions, duties or obligations concerning the premises whether under any federal, state, or local statue, rule, regulation, or ordinance, all such liability, if any, being expressly waived, and that any recovery on this instrument and the NOTE secured hereby shall be solely against and out of the property hereby conveyed by enforcement of the provisions hereof and of said NOTE, but this waiver shall in no way affect the personal liability of any co-signer, endorser or guarantor of said NOTE. Each original and successive owner of holder of this instrument accepts the same upon the express condition that no duty shall rest upon the Trustee because of the execution, during its existence, or after its foreclosure to be personally liable for any environmental conditions, duties, or obligations concerning the premises whether under any federal, state, or local statue, rule, regulation, or ordinance. The Trustee makes no personal representations as to nor shall it be responsible for the existence, location or maintenance of the chattels herein described, if any, or of any environmental conditions, duties, or obligations concerning he property whether under any federal, state, or local statute, rule, regulation, or ordinance. The beneficiaries of this Trust, have management and control of the use of the property and as such, have the authority on their own behalf to execute any document as environmental representative but not as agent for or on behalf of the Trustee.

27

**STATE OF ILLINOIS**

**COUNTY OF**
_Lake_

| ss.

    The foregoing instrument was acknowledged before me this _28th_ day of
_November_ _____, 20 _05_ , by
_BARBARA Richter_ _____ as _TRUST OFFICER_ of
_BANK OF WAUKEGAN N/K/A NoRStates BANK_, a
_____ _BANKING Corporation_ _____

    Witness my hand and official seal.

    My commission expires: _8/22/09_

[SEAL]

_Notary Public_

"OFFICIAL SEAL"
CYNTHIA M. JONES
Notary Public, State of Illinois
My Commission Expires 8/22/09

Page 1 of 27

_28_

08CV4495
JUDGE MANNING
MAGISTRATE JUDGE SCHENKIER
EDA

Loan No.. 625640141

(NOTE THIS PROMISSORY NOTE MAY REQUIRE A BALLOON PAYMENT AT MATURITY)

**PROMISSORY NOTE**

$370,000 00 (U S )                                                November 28, 2005

FOR VALUE RECEIVED, the undersigned (individually and collectively, "Borrower"), jointly and severally, promise to pay to the order of WASHINGTON MUTUAL BANK, a federal association, at its office at National Commercial Operations Center P O Box 650528, Dallas, Texas 75265-0528, or at such other place as the holder of this Note ("Lender") may from time to time designate in writing, the sum of $370,000.00 in lawful money of the United States, with interest thereon from the date of disbursement by Lender (whether into escrow or otherwise) until paid at the rates set forth below. Except as otherwise provided in the immediately following sentence, interest for each full calendar month during the term of this Note will be calculated on the basis of a 360-day year consisting of 12 months of 30 days each ("30/360 Basis") Interest for the full or partial calendar month at the beginning of the term of this Note will be calculated on the basis of a 360-day year and the actual number of days elapsed. Interest for any partial calendar month at the end of the term of this Note will be calculated on the basis of a 365-or 366-day year, as applicable, and the actual number of days elapsed. The Monthly Payment Amounts (as defined below) will be calculated on a 30/360 Basis

**SECTION 1    Initial Interest Rate.**

The per annum interest rate hereunder (the "Note Rate") shall initially be a rate (the "Initial Rate") determined as follows (and, in either case, subject to adjustment on and after the Initial Interest Adjustment Date as provided in Section 2 below)

(a) If the Initial Monthly Payment Date (as defined below) is in the first calendar month after the month in which the loan evidenced by this Note is funded, the Initial Rate shall be 5.97000% per annum (the 'Stated Interest Rate")

(b) If the Initial Monthly Payment Date is in the second calendar month after the month in which the loan evidenced by this Note is funded, the Initial Rate, applicable through the day before the date that is one month before the Initial Monthly Payment Date (as defined below), shall be a rate equal to the higher of (i) the Stated Interest Rate, or (ii) the Current Monthly Adjustable Index (as defined below) plus the Margin (as defined below) Thereafter, through the day immediately prior to the Initial Interest Adjustment Date, the Note Rate shall be the Stated Interest Rate

**SECTION 2    Interest Rate Adjustments.**

(a) **Interest Adjustment Date.** Beginning on December 1, 2012 (the "Initial Interest Adjustment Date"), and on the same day of every month thereafter, the Note Rate shall be adjusted as provided below Each date on which the Note Rate is to be adjusted as provided in this Note is referred to as an "Interest Adjustment Date."

(b) **The Monthly Adjustable Index.** Beginning with the Initial Interest Adjustment Date, the Note Rate will be based on the Monthly Adjustable Index As used in this Note, the term "Monthly Adjustable Index" means the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates H 15 (519)" (the "Monthly Yields"). The "Twelve-Month Average" is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12 The most recent Monthly Adjustable Index figure available as of 15 days before each Interest Adjustment Date is referred to in this Note as the "Current Monthly Adjustable Index." If the

EXHIBIT B

Loan No  625640141

Twelve-Month Average is no longer available, Lender shall choose a new index that is based upon comparable information and such new index shall then be the Monthly Adjustable Index  Lender shall give Borrower notice of such choice

(i)  Before each Interest Adjustment Date, Lender will calculate the new Note Rate by adding 2 50000% (the "Margin") to the Current Monthly Adjustable Index.  Lender will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%).  Subject to the limits stated in Section 2(b)(ii) below, this rounded amount will be the Note Rate until the next Interest Adjustment Date

(ii)  Except as set forth in Section 9 below, the Note Rate will never be greater than 10.51900% per annum (the "Rate Limit")

(iii)  If for any reason Lender fails to make an adjustment to the Note Rate or the Monthly Payment Amount as described in this Note  regardless of any notice requirement, Lender may, upon discovery of such failure, then make such adjustment as if it had been made on time. Borrower agrees not to hold Lender responsible for any damages that may result from Lender's failure to make the adjustment and to allow Lender, at its option, to apply any excess monies that Borrower may have paid to partial prepayment of the unpaid principal balance of this Note, provided that such prepayment shall not be subject to any Prepayment Premium provided for in any addendum to this Note

**SECTION 3.  Monthly Payments.**

Beginning on January 1, 2006 (the "Initial Monthly Payment Date") and on the same day of each and every calendar month thereafter throughout the term of this Note (the "Monthly Payment Dates"). Borrower shall make monthly payments of principal and interest (the "Monthly Payment Amounts") to Lender as provided below   Each Monthly Payment Amount will be calculated on the basis of an amortization period (the "Amortization Period") of 360 months ending on the date that is that number of months after the day that is one month before the Initial Monthly Payment Date

(a)  Beginning on January 1, 2006 the Monthly Payment Amount shall be $2,211 21 for each month prior to the Initial Payment Change Date (as defined in subparagraph (b) below)

(b)  The Monthly Payment Amount shall be adjusted annually beginning on January 1, 2013 (the "Initial Payment Change Date") to an amount sufficient to fully repay the unpaid principal balance of this Note, together with interest at the Note Rate as most recently adjusted prior to the applicable Amortization Adjustment Date (as defined below), by the end of the Amortization Period in substantially equal installments   Each date on which the Monthly Payment Amount will be adjusted pursuant to this Section 3 is referred to as an "Amortization Adjustment Date "

(c)  Except as otherwise provided below, the amount of monthly payments on this Note shall not increase or decrease on any Amortization Adjustment Date by more than 7 50000% of the amount of the monthly payment in effect immediately prior to such Amortization Adjustment Date Notwithstanding the foregoing

(i)  On the fifth anniversary of the date the first payment on this Note is due and on the same day of every fifth year thereafter (with the exception of such dates, if any, occurring prior to the Initial Interest Adjustment Date), the Monthly Payment Amount will be adjusted without applying such limitation

(ii)  Since the Monthly Payment Amount changes less frequently than the Note Rate and since the Monthly Payment Amount is subject to the limitation described above, the Monthly Payment Amount could be greater or less than the accrued interest on this Note.  For each monthly payment that is less than the amount of accrued interest on this Note for the month immediately preceding

Loan No  625640141

the month in which such payment is due, Lender will subtract the amount of the monthly payment from the amount of such accrued interest and will add the difference to the principal balance of this Note (commonly referred to as "negative amortization")  Thereafter, interest will accrue on the principal balance as so increased  For each monthly payment that is greater than the amount of such accrued interest, Lender will apply the excess to reduce the principal amount of this Note.  If the unpaid principal amount of this Note should ever equal or exceed 110 00000% of the original principal amount of this Note (the "Maximum Principal Amount") for any reason, on the next Monthly Payment Date (A) Borrower shall pay such principal balance down to the Maximum Principal Amount, and (B) the Monthly Payment Amount shall be adjusted to an amount sufficient to fully repay the unpaid principal balance of this Note, together with interest at the most recently adjusted Note Rate, by the end of the Amortization Period in substantially equal installments  Such adjustment shall be made without applying the above limitation

### SECTION 4.  Maturity.

Any and all remaining unpaid principal of and interest on this Note shall be due and payable in full on December 1, 2035 (the "Maturity Date").

### SECTION 5.  Application of Payments.

So long as no Event of Default (as used in this Note, the terms "Event of Default" and "Default" have the meanings given to those terms in the Security Instrument described in Section 8) exists, payments under this Note and the Security Documents shall be applied  (a) first, to the payment of accrued interest, (b) second, at the option of Lender, to the payment of any other amounts owing under this Note or secured by the Security Documents, other than accrued interest and principal, including, but not limited to advances Lender may have made for attorneys' fees or for taxes, assessments, insurance premiums, or other charges on any property given as security for this Note and late charges due hereunder; and (c) third, to the reduction of principal of this Note.  After the occurrence and during the continuance of an Event of Default, Lender may apply such payments to the obligations secured by the Security Instrument in such manner as it may elect in its sole discretion

### SECTION 6  Prepayment.

Borrower may prepay its obligation under this Note only if, to the extent and on the terms and subject to the conditions set forth in an addendum to this Note attached hereto and incorporated herein by this reference  If no such addendum is attached to this Note, Borrower may not prepay its obligation under this Note.  Notwithstanding the foregoing, if no such addendum is attached to this Note and Lender, in its sole discretion, agrees to permit a prepayment, then it may do so on such terms and conditions as it may require in its sole discretion.  No partial prepayment of this Note shall change the date or amount of any subsequent monthly payment required under the terms of this Note prior to payment in full of all amounts owing under this Note unless otherwise agreed in writing by Lender in its sole discretion

### SECTION 7.  Late Charge.

If any amount payable under this Note is not paid within 15 days after the due date thereof, Borrower shall pay a late charge of 5 00000% of the delinquent amount as liquidated damages for the extra expense in handling past due payments, provided, however, that no such late charge shall be payable with respect to any balloon payment due on the Maturity Date  Any late charge payable under this section is in addition to any interest payable at the Default Rate (as defined below)

### SECTION 8.  Security.

This Note is secured by a deed of trust, security agreement, assignment of leases and rents, and fixture filing or a mortgage, security agreement, assignment of leases and rents, and fixture filing (the

Page 3 of 5

Loan No 625640141

"Security Instrument") of even date herewith and executed by Borrower, encumbering the real property described in the Security Instrument  The Security Instrument and any and all other documents securing this Note are collectively referred to as the "Security Documents", provided, however, that "Security Documents" specifically shall not mean and shall not include the certificate and indemnity agreement regarding hazardous substances being delivered concurrently herewith to Lender by Borrower (the "Indemnity Agreement")   The real property and the other collateral provided for in the Security Documents are collectively referred to as the "Property "

Notwithstanding anything to the contrary in this Note or the Security Documents, this Note shall not evidence Borrower's obligations under the Indemnity Agreement and nothing contained in this Note or the Security Documents shall be deemed to limit or expand Borrower's obligations under such Indemnity Agreement  All of such obligations (and all substantial equivalents of such obligations) shall constitute the separate, unsecured recourse obligations of Borrower and shall not be deemed to be evidenced by this Note or secured by the Security Documents

### SECTION 9.  Default; Remedies.

If any amount payable under this Note is not paid within 15 days after the date when due or if any other Event of Default has occurred and is continuing, then, at the option of Lender, the entire indebtedness evidenced hereby shall become immediately due and payable  Upon the occurrence of an Event of Default, and without notice or demand, all amounts owed under this Note, including all accrued but unpaid interest, shall thereafter bear interest at a variable rate, adjusted at the times at which the Note Rate would otherwise have been adjusted pursuant to Section 2,  of 5% per annum above the Note Rate that would have been applicable from time to time had there been no Event of Default (the "Default Rate") until all Events of Default are cured  Failure to exercise any option granted to Lender hereunder shall not waive the right to exercise the same in the event of any subsequent Event of Default.  Interest at the Default Rate shall commence to accrue upon the occurrence of any Event of Default, including the failure to pay this Note at maturity.

### SECTION 10.  Attorneys' Fees.

In the event of any Default, or in the event that any dispute arises relating to the interpretation, enforcement, or performance of this Note, Lender shall be entitled to collect from Borrower on demand all fees and expenses incurred in connection therewith, including but not limited to fees of attorneys, accountants, appraisers, environmental inspectors, consultants, expert witnesses, arbitrators, mediators, and court reporters  Without limiting the generality of the foregoing, Borrower shall pay all such costs and expenses incurred in connection with   (a) arbitration or other alternative dispute resolution proceedings, trial court actions, and appeals, (b) bankruptcy or other insolvency proceedings of Borrower, any guarantor or other party liable for any of the obligations of this Note or any party having any interest in any security for any of those obligations; (c) judicial or nonjudicial foreclosure on, or appointment of a receiver for, any property securing this Note, (d) postjudgment collection proceedings, (e) all claims, counterclaims, cross-claims, and defenses asserted in any of the foregoing whether or not they arise out of or are related to this Note or any security for this Note, (f) all preparation for any of the foregoing; and (g) all settlement negotiations with respect to any of the foregoing

### SECTION 11.  Miscellaneous.

(a) Every person or entity at any time liable for the payment of the indebtedness evidenced hereby waives presentment for payment, demand, and notice of nonpayment of this Note. Every such person or entity further hereby consents to any extension of the time of payment hereof or other modification of the terms of payment of this Note, the release of all or any part of the security herefor or the release of any party liable for the payment of the indebtedness evidenced hereby at any time and from time to time at the request of anyone now or hereafter liable therefor  Any such extension or

Loan No  625640141

release may be made without notice to any of such persons or entities and without discharging their liability.

(b) Each person or entity who signs this Note is jointly and severally liable for the full repayment of the entire indebtedness evidenced hereby and the full performance of each and every obligation contained in the Security Documents; provided, however, that if, but only if, a Limited Liability Addendum is attached to and incorporated into this Note, the liability of any person or entity that signs this Note will be limited as provided in such Addendum

(c) The headings to the various sections have been inserted for convenience of reference only and do not define, limit, modify, or expand the express provisions of this Note

(d) Time is of the essence under this Note and in the performance of every term, covenant and obligation contained herein

(e) This Note is made with reference to and is to be construed in accordance with the laws of the state where the Property is located

(f) Notwithstanding any contrary provision of applicable law, each general partner in any partnership that is a party hereto, agrees that Lender need not exhaust the partnership assets of such partnership before executing upon the assets of such general partner in satisfaction of the obligations evidenced hereby or by any other document, instrument or agreement entered into by such partnership in connection with the loan evidenced by this Note, but may execute upon such general partner's assets prior to, at the same time as, or after executing upon the partnership assets of such partnership  Each such general partner shall be jointly and severally liable for such obligations with all other persons and entities liable therefor

(g) If Lender at any time discovers that this Note or any of the Security Documents contains any error that was caused by a clerical mistake, calculation error, computer error, printing error or similar error, Borrower shall, upon demand by Lender re-execute any such documents as are necessary or appropriate to correct any such error and Lender shall have no liability to Borrower or any other person or entity as a result of such error  If this Note or any of the Security Documents are lost, stolen, mutilated or destroyed and Lender delivers to Borrower an indemnification agreement reasonably indemnifying Borrower against any loss or liability resulting therefrom, Borrower will execute and deliver to Lender a replacement thereof in form and content identical to the original document, which will have the effect of the original for all purposes.

DATED as of the day and year first above written

Forever Construction, Inc , an Illinois corporation

By  Jorge Torres, President

BANK OF WAUKEGAN N/K/A NORSTATES BANK SOLELY
AS TRUSTEE AND NOT PERSONALLY OR INDIVIDUALLY
UNDER TRUST NO. 204453.

BY: _Barbara Richter_____
    BARBARA RICHTER - TRUST OFFICER

RIDER ATTACHED HERETO IS EXPRESSLY
MADE A PART HEREOF

AS Exhibit "A"

Exhibit "A"

## TRUSTEE'S EXONERATION RIDER

This PROMISSORY NOTE is executed by BANK OF WAUKEGAN N/K/A **NORSTATES BANK** , not personally or individually, but as Trustee under Trust Agreement dated August 23, 2002 and known as Trust No 204453 in the exercise of the power and authority conferred upon and vested in it as such Trustee    It is expressly understood and agreed by each original and successive owner or holder of this NOTE that nothing herein contained shall be construed as creating any personal liability on BANK OF WAUKEGAN N/K/A **NORSTATES BANK** to pay this NOTE or any interest that may accrue hereunder, all such liability, if any, being expressly waived, and that any recovery on this NOTE or on instrument given to secure its payment shall be solely against and out of the property described in said instrument by enforcement of the provisions contained in said instrument and NOTE, but this waiver shall in no way affect the personal liability of any co-signed, endorser or guarantor of this NOTE    Each original and successive owner or holder of this NOTE accepts the same upon the express condition that no duty shall rest upon the Trustee to sequester the rents, issues and profits arising from the property described in said instrument or the proceeds arising from the sale or other disposition thereof or for any environmental conditions, duties, or obligations concerning the property whether under any federal, state, or local statute, rule, regulation or ordinance    The Trustee makes no personal representations as to nor shall it be responsible for the existence, location or maintenance of the chattels herein described, if any, or of any environmental conditions, duties or obligations    (expressed or implied) concerning the property whether under any federal, state, or local statute, rule, regulation, or ordinance    The beneficiaries of this Trust have management and control of the use of the property and as such, have authority on their own behalf to execute documents as environmental representative but not as agent for or on behalf of the Trustee

Loan No. **625640141**

## PREPAYMENT ADDENDUM TO PROMISSORY NOTE
### (Yield Maintenance Prepayment Premium –
### For Fixed to Floating Rate Hybrid Note)

This Addendum is attached to, incorporated into and forms an integral part of, the Promissory Note dated **November 28, 2005** made by the undersigned in favor of Washington Mutual Bank, a federal association, as if the following terms and provisions were set forth in full in the body thereof:

1.    **Prepayment Prior to Initial Interest Adjustment Date**. Borrower may, at any time prior to the Initial Interest Adjustment Date, upon 30 days' prior written notice to Lender, prepay its obligation under this Note in full or in part, but only upon payment of a premium (the "Prepayment Premium") equal to the greater of:

        (i)    1% of the amount of principal being prepaid; or

        (ii)    The product obtained by multiplying:

            (A)    the amount of principal being prepaid,

        *by*

            (B)    the difference obtained by subtracting from the Note Rate the yield rate (the "Yield Rate") on the **3.875 %** U.S. Treasury Security due **February 2013** (the "Specified U.S. Treasury Security"), as the Yield Rate is reported in *The Wall Street Journal* on the twenty-fifth Business Day preceding the Prepayment Date (as defined below).

        *by*

            (C)    the present value factor calculated using the following formula:

$$\frac{1 - (1 + r)^{-n/12}}{r}$$

[r =    Yield Rate
n =    the number of months remaining between the Prepayment Date and the Initial Interest Adjustment Date ]

Prepayment Addendum to Promissory Note
Page 1 of 3

SG 2110317 v4

In the event that no Yield Rate is published for the Specified U.S Treasury Security, then the nearest equivalent U S Treasury Security shall be selected at Lender's discretion If the publication of such Yield Rates in *The Wall Street Journal* is discontinued, Lender shall determine such Yield Rates from another source selected by Lender.

For purposes of this Addendum, the "Prepayment Date" shall be (x) in the case of a voluntary prepayment, the date on which the prepayment is made, and (y) in any other case, the date on which Lender accelerates the unpaid principal balance of this Note or, if no acceleration has occurred, the date on which Lender first applies any collateral or other security to the unpaid principal balance of this Note

2    **Prepayment After Initial Interest Adjustment Date**    After the Initial Interest Adjustment Date, Borrower may, upon 30 days' prior written notice to Lender, prepay its obligation under this Note in full or in part without payment of a Prepayment Premium

3.    **Provisions Applicable to All Prepayments.**    Borrower expressly waives any right to prepay this Note except as provided in this Addendum  Therefore, if the maturity of this Note is accelerated for any reason, including, without limitation, the occurrence of any Event of Default, including without limitation an Event of Default under Section 4.13 of the Security Instrument, then any subsequent tender of payment of this Note, including any redemption following foreclosure of the Security Instrument, shall constitute an evasion of the restrictions on prepayment set forth herein and shall be deemed a voluntary prepayment Accordingly, Lender may impose as a condition to accepting any such tender, and may bid at any sheriff's or trustee's sale under the Security Instrument, and/or include in any complaint for judicial foreclosure or any claim in bankruptcy, as part of the indebtedness evidenced by this Note and secured by the Security Instrument, the Prepayment Premium that would have otherwise been payable hereunder for prepayment of this Note occurring on the date of such acceleration  The Prepayment Premium will not be payable for prepayment of this Note made with insurance or condemnation proceeds if Lender requires those proceeds to be applied to payment of this Note pursuant to the terms of the Security Instrument  Notwithstanding the foregoing, if an Event of Default exists on the date of the applicable casualty or condemnation, and such date is prior to the Initial Interest Adjustment Date, the Prepayment Premium will be payable  The Prepayment Premium will be payable with respect to any other prepayment made prior to the Initial Interest Adjustment Date from any collateral for this Note. No partial prepayment of this Note shall change the date or amount of any subsequent monthly payment required under the terms of this Note prior to payment in full of all amounts owing under this Note unless otherwise agreed in writing by Lender in its sole discretion.

Acceptance by Lender of any one or more prepayments without concurrent payment of any applicable Prepayment Premium or other amount provided for above will not constitute

SE 2110817 v4

a waiver of Lender's right to require payment of any Prepayment Premium or other amount provided for above.

Borrower acknowledges that (a) it is a knowledgeable real estate investor, (b) it fully understands the effect of the waivers set forth in this Addendum, (c) the making of the loan evidenced by this Note at the interest rates set forth in this Note is sufficient consideration for such waivers, and (d) Lender would not make the loan evidenced by this Note without such waivers.

Borrower acknowledges that any statement made by Lender setting forth the amount of the Prepayment Premium shall only be binding upon Lender if such statement is made in writing and that the amount of the Prepayment Premium set forth in such statement is subject to change and is valid only for the date of such statement.

If the Property is located in California, Borrower hereby expressly waives any right it may have under California Civil Code 2954.10 to prepay this Note, in whole or in part, without prepayment charge, upon acceleration of the Maturity Date of this Note, and agrees that if for any reason a prepayment of any or all of this Note is made, whether voluntarily or upon or following any acceleration of the Maturity Date of this Note by Lender, Borrower shall pay the Prepayment Premium calculated pursuant to this Addendum. By signing this provision in the space provided below, Borrower hereby declares and agrees that Lender's agreement to make the loan evidenced by this Note at the Note Rate and for the term set forth in this Note constitutes adequate consideration, given individual weight by Borrower, for this waiver and agreement

DATED as of the date of the Note to which this Addendum is attached.

Forever Construction, Inc., an Illinois corporation

By: Jorge Torres, President

*N/K/A NORSTATES BANK*

Bank of Waukegan as Trustee under Trust Agreement dated August 23, 2002 and known as Trust Number 204453

*TRUST OFFICER*
*N/K/A NORSTATES BANK*

By. Bank of Waukegan as Trustee under Trust Agreement dated August 23, 2002 and known as Trust Number 204453

Prepayment Addendum to Promissory Note
Page 3 of 3

SF-2110817 v4

**PAGE 3 "A"**

**TRUSTEE'S EXONERATION RIDER**

This PREPAYMENT ADDENDUM TO PROMISSORY NOTE is executed by BANK OF WAUKEGAN N/K/A **NORSTATES BANK ,** not personally or individually, but as Trustee under Trust Agreement dated August 23, 2002 and known as Trust No 204453 in the exercise of the power and authority conferred upon and vested in it as such Trustee It is expressly understood and agreed by each original and successive owner or holder of this NOTE that nothing herein contained shall be construed as creating any personal liability on BANK OF WAUKEGAN N/K/A **NORSTATES BANK** to pay this NOTE or any interest that may accrue hereunder, all such liability, if any, being expressly waived, and that any recovery on this NOTE or on instrument given to secure its payment shall be solely against and out of the property described in said instrument by enforcement of the provisions contained in said instrument and NOTE, but this waiver shall in no way affect the personal liability of any co-signed, endorser or guarantor of this NOTE Each original and successive owner or holder of this NOTE accepts the same upon the express condition that no duty shall rest upon the Trustee to sequester the rents, issues and profits arising from the property described in said instrument or the proceeds arising from the sale or other disposition thereof or for any environmental conditions, duties, or obligations concerning the property whether under any federal, state, or local statute, rule, regulation or ordinance The Trustee makes no personal representations as to nor shall it be responsible for the existence, location or maintenance of the chattels herein described, if any, or of any environmental conditions, duties or obligations (expressed or implied) concerning the property whether under any federal, state, or local statute, rule, regulation, or ordinance The beneficiaries of this Trust have management and control of the use of the property and as such, have authority on their own behalf to execute documents as environmental representative but not as agent for or on behalf of the Trustee

08CV4495
JUDGE MANNING
MAGISTRATE JUDGE SCHENKIER
EDA

Loan No   625640141

# GUARANTY

In consideration of WASHINGTON MUTUAL BANK, a federal association ("Lender") lending $370,000 00 (the "Loan") to

Forever Constructions, Inc , an Illinois corporation ("Borrower"),

the undersigned (collectively, whether one or more in number, "Guarantor"), jointly and severally with one another and with all other parties executing similar guaranties, if any, hereby unconditionally and irrevocably guarantees to Lender prompt payment of the Loan when due, whether by acceleration or otherwise, together with all interest thereon, any other sums that become due and owing to Lender under the Note (as defined below) or any of the other Loan Documents (as defined below), including, without limitation, late charges, premiums for prepayment, expenditures by Lender to preserve and protect the collateral for repayment of the Note, amounts that would become due but for the effect of any bankruptcy proceedings or other insolvency proceedings and all attorneys' fees, costs, and expenses of collection incurred by Lender in enforcing its rights and remedies under the Note and the other Loan Documents, and together with the full and complete discharge and performance of each and every other term, covenant, obligation, or warranty contained in the Note or any of the other Loan Documents   All obligations guaranteed under this Guaranty are referred to as the "Guaranteed Obligations "

The Loan is evidenced by a promissory note (the "Note") from Borrower dated November 28, 2005 in the amount of $370,000 00, bearing interest and payable as set forth therein, repayment of which is secured by the documents identified in the Note as the "Security Documents " The Note, the Security Documents and all other documents, instruments and agreements (other than and specifically excluding any certificate and indemnity agreement regarding hazardous substances) now in effect or hereafter entered into in connection with the Loan (including but not limited to those entered into in connection with any amendment of any thereof) are referred to, collectively, in this Guaranty as the "Loan Documents " Notwithstanding anything to the contrary, no certificate and indemnity agreement regarding hazardous substances shall be a Loan Document as that term is used in this Guaranty   Terms that are defined in the Note shall have the meaning set forth therein when used in this Guaranty

Notwithstanding anything to the contrary set forth in this Guaranty or any other Loan Document, this Guaranty is not, and will not be, secured by any Security Document encumbering any property of Borrower

## GUARANTOR FURTHER AGREES THAT:

1.  Guarantor has a direct financial interest in Lender's making the Loan

2   The obligations of Guarantor under this Guaranty are primary, absolute, and unconditional under any and all circumstances unless and until terminated as provided in Section 17 below and irrespective of the value, genuineness, validity or enforceability of the Guaranteed Obligations

3   Without affecting, diminishing, or otherwise impairing the liability of Guarantor under this Guaranty and without notice to or consent of Guarantor, Lender may from time to time grant renewals, extensions, indulgences, releases, and discharges to Borrower or any other person or entity, and may take security for payment of the Guaranteed Obligations, and may release any or all security for the Guaranteed Obligations or refrain from perfecting any interest in any security for the Guaranteed Obligations

4   Lender may agree to amend or modify the Note or any other Loan Document, and otherwise may deal with Borrower or any other person or entity, without notice to or consent of Guarantor, and without affecting, diminishing, or otherwise impairing the liability of Guarantor under this Guaranty

EXHIBIT C

Loan No   625640141

5   Guarantor shall not be subrogated to Lender in respect of any action taken or permitted by Lender against Borrower or any other person or entity, until Lender has received payment and performance in full of all of the Guaranteed Obligations and all of Guarantor's obligations under this Guaranty

6   Lender may from time to time consent to any action or nonaction of Borrower or any other person or entity that, in the absence of such consent, would violate any provision of any of the Loan Documents, and such consent may be granted by Lender without in any manner affecting, diminishing, or impairing the liability of Guarantor under this Guaranty

7   This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or otherwise must be returned by Lender upon the insolvency, bankruptcy, or reorganization of the payor, all as though such payment to Lender had not been made

8   No change in the name, purposes, capitalization, or organization of Borrower shall in any way affect, diminish, or otherwise impair the liability of Guarantor under this Guaranty   Lender shall not be obligated to inquire into the powers or capacity of Borrower or the authority of any person or entity executing the Note or any other Loan Document on behalf of Borrower or any other person or entity   No absence or limitation of any such power, capacity or authority shall impair Guarantor's liability for the Guaranteed Obligations

9   Lender shall not be obligated to exhaust its recourse against Borrower, or any other person or entity, or any security it may have for the Guaranteed Obligations, before being entitled to payment from Guarantor of the Guaranteed Obligations   Lender may, at its sole discretion, exercise its rights under this Guaranty either prior to, concurrently with, or after the exercise of its remedies against Borrower or any other person or entity liable for the Guaranteed Obligations and, in this regard, Guarantor hereby expressly waives any limitations on a concurrent exercise of remedies under this Guaranty and any other Loan Documents that may be imposed by applicable law   This is a guaranty of payment and not merely of collection

10   Notwithstanding the provisions of the laws of any state relating to the rate of interest payable by Borrower, this Guaranty shall remain in full force and effect whatever the rate of interest received or demanded by Lender, and no invalidity, irregularity, or unenforceability (by reason of any bankruptcy or similar law, any other law, or any order of any government or agency thereof purporting to reduce, amend, or otherwise affect any indebtedness or liability of Borrower or of any security therefor) and no release or discharge of Borrower in any receivership, bankruptcy, winding-up, or other creditor proceedings shall affect, diminish, or otherwise impair or otherwise be a defense to this Guaranty   Guarantor shall pay any interest on the Guaranteed Obligations that accrues after the commencement of any proceeding referred to in the foregoing sentence (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such proceedings, such interest as would have accrued if those proceedings had not been commenced) because it is the intention of Guarantor that Guarantor's obligations to Lender be determined without regard to any rule of law or order that may relieve Borrower of any of Borrower's obligations to Lender

11   This Guaranty has been delivered free of any conditions and no representations have been made to Guarantor affecting or limiting the liability of Guarantor under this Guaranty except those, if any, specifically set forth in this Guaranty   This Guaranty is in addition to and not in substitution for any other guaranties held or that may hereafter be held by Lender, and Guarantor is jointly and severally liable with all other guarantors for payment of the Guaranteed Obligations

12   No action or proceeding brought or instituted under this Guaranty and no recovery in pursuance thereof shall be a bar or defense to any further action or proceeding that may be brought under

Loan No   625640141

this Guaranty by reason of any further default or defaults under this Guaranty or in the performance and observance of the terms, covenants, conditions, and provisions in the Note or the other Loan Documents

13  In the event of any default under the Note, any other Loan Document, this Guaranty, any other guaranty of the Loan, or any amendment or modification of any of the foregoing, or in the event that any dispute arises relating to the interpretation, enforcement, or performance of any of the foregoing, Lender shall be entitled to collect from Guarantor on demand all fees and expenses incurred in connection therewith, including but not limited to fees of attorneys (and legal assistants), accountants, appraisers, environmental inspectors, consultants, expert witnesses, arbitrators, mediators, and court reporters Without limiting the generality of the foregoing, Guarantor shall pay all such costs and expenses incurred in connection with (a) arbitration or other alternative dispute resolution proceedings, trial court actions, and appeals, (b) bankruptcy or other insolvency proceedings of Guarantor, any other guarantor, or any other party liable for any of the Guaranteed Obligations or any party having any interest in any security for any of the Guaranteed Obligations, (c) judicial or nonjudicial foreclosure on, or appointment of a receiver for, any property securing any of the Guaranteed Obligations, (d) postjudgment collection proceedings, (e) all claims, counterclaims, cross-claims, and defenses asserted in any of the foregoing whether or not they arise out of or are related to the Loan, (f) all preparation for any of the foregoing, and (g) all settlement negotiations with respect to any of the foregoing.  All such costs, expenses, and fees shall be due and payable upon demand and shall bear interest from the date incurred through the date of collection at the Default Rate (as defined in the Note)

14  No waiver, modification, extension, forbearance, or delay on the part of Lender with respect to the Note or any other Loan Document, or any other guaranty, and no act or thing that might, but for this provision of this Guaranty, be deemed a legal or equitable discharge of a surety, shall operate to release the obligations of Guarantor under this Guaranty, and no delay on the part of Lender in exercising any of its options, powers, or rights under this Guaranty, or a partial or single exercise thereof, shall constitute a waiver of any other rights under this Guaranty

15  Guarantor hereby waives presentment, protest, notice, demand, or action on delinquency in respect of the Guaranteed Obligations  Guarantor waives acceptance of this Guaranty  Guarantor waives any defense based on any statute or rule of law providing that the obligation of a guarantor or surety must not be larger in amount or otherwise more burdensome than that of the principal obligor  Guarantor waives any right it might otherwise have to require marshaling of any collateral for the Loan or to require that any such collateral be sold in parcels or in any particular order

16  This Guaranty shall survive the realization upon any collateral given as security for the Guaranteed Obligations (including the realization on the real property collateral by nonjudicial proceedings) or the exercise of any other remedy contained in any Loan Document or otherwise available to Lender  This Guaranty shall terminate only as provided in Paragraph 17 below  Guarantor agrees that the obligations of Guarantor under this Guaranty are separate and distinct from those of Borrower under the Note and the other Loan Documents and expressly waives the benefit of any provision of applicable law limiting Lender's right to a deficiency judgment after any judicial or nonjudicial foreclosure  All of Guarantor's obligations under this Guaranty shall constitute fully-recourse obligations of Guarantor

17  This Guaranty shall inure to the benefit of Lender and its successors and assigns (as used in this Guaranty, the term "Lender" refers to the party identified as "Lender" in the first paragraph of this Guaranty and its successors and assigns as holders of the Note), and shall be binding upon Guarantor and Guarantor's heirs, personal representatives, successors, and assigns, as the case may be, provided, however, that this Guaranty shall terminate when the principal and interest of the Loan and all other Guaranteed Obligations are indefeasibly paid in full  Guarantor waives any other rights Guarantor might otherwise have to terminate or modify this Guaranty

Loan No   625640141

18  In the event of a conflict between the provisions of this Guaranty and the provisions of the Note, the provisions of this Guaranty shall control

19  This Guaranty shall be governed by and construed in accordance with the laws of the state where the real property collateral securing the Loan is located   Guarantor hereby submits to the nonexclusive jurisdiction of the state and federal courts sitting in such state and agrees that any legal action or proceeding seeking to enforce this Guaranty, or based upon or arising out of this Guaranty or any transaction provided for or guaranteed herein, may at the sole option of Lender be brought in or transferred to such courts   Guarantor waives any objection to the laying of venue in such courts based on an argument that any such court is an inconvenient forum   Notwithstanding the foregoing, Lender may, at its sole option, bring any such action or proceeding in any other court having jurisdiction

20  Notwithstanding any contrary provision of applicable law, each general partner in any partnership that is a party to this Guaranty, agrees that Lender need not exhaust the partnership assets of such partnership before executing upon the assets of such general partner in satisfaction of the obligations under this Guaranty, but may execute upon such general partner's assets prior to, at the same time as, or after executing upon the partnership assets of such partnership   Each such general partner shall be jointly and severally liable for such obligations with all other persons and entities liable therefor

21  **EACH OF GUARANTOR AND LENDER (FOR ITSELF AND ITS SUCCESSORS, ASSIGNS AND PARTICIPANTS) WAIVES ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THIS GUARANTY, THE LOAN DOCUMENTS OR THE TRANSACTIONS PROVIDED FOR HEREIN OR THEREIN, IN ANY LEGAL ACTION OR PROCEEDING OF ANY TYPE BROUGHT BY ANY PARTY TO ANY OF THE FOREGOING AGAINST ANY OTHER SUCH PARTY, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT SITTING WITHOUT A JURY**

DATED this 28th day of November, 2005

GUARANTOR

Jorge Torres

STATE OF ILLINOIS

ss.

COUNTY OF

_Lake_

The foregoing instrument was acknowledged before me this _20_ day of
_November_____ , 20 _05_, by
_____ _Jorge Tares_ as _____ of
_____ , a
_____
_____ .

Witness my hand and official seal.

My commission expires: _____

[SEAL]

*Notary Public*

"OFFICIAL SEAL"
Alexis M. Castellano
Notary Public, State of Illinois
My Commission Expires 05/01/2006